# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CLYDE EDWARD SMITH**                                      **CIVIL ACTION**

**VERSUS**                                                          **NO. 18-10642**

**KEITH DEVILLE, WARDEN**                          **SECTION: "H"(1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

## I. State Court Factual and Procedural Background

Petitioner, Clyde Edward Smith, is a state prisoner incarcerated at the Allen Correctional Center in Kinder, Louisiana. On May 23, 2011, Smith was charged by an amended bill of information with possession with intent to distribute Hydrocodone (Lortab) in violation of La. Rev. Stat. § 40:967(A) (count one), possession with intent to distribute Alprazolam (Xanax) (count two) and Carisoprodol (Soma) (count three) both in violation of La. Rev. Stat. § 40:969(A) (count three).[1] After a trial, a jury found petitioner guilty as charged as to counts one and two and guilty

---

[1] State Rec., Vol. 1 of 4, Amended Bill of Information dated May 23, 2011.

of the lesser offense of attempted possession with the intent to distribute Carisoprodol as to count three.[2]  On September 14, 2011, the trial court denied petitioner's motions for new trial and post verdict judgment of acquittal.[3]  The state filed a multiple bill charging Smith as a fourth felony offender.[4]  On November 16, 2011, after a hearing, the trial court adjudicated Smith a habitual offender.[5]  On November 18, 2011, the trial court sentenced petitioner to thirty years as to count one, ten years as to count two, and five years as to count three, with all terms of imprisonment to be served at hard labor without the benefit of probation or suspension of sentence and to run concurrently.[6]  The trial court denied petitioner's motion to reconsider his sentence.[7]

On May 2, 2014, the Louisiana First Circuit Court of Appeal affirmed petitioner's convictions, habitual offense adjudications, and sentences.[8]  The Louisiana Supreme Court denied writs without stated reasons on January 16, 2015.[9]  Petitioner did not file for a writ of certiorari with the United States Supreme Court.

On June 30, 2015, petitioner filed an application for post-conviction relief with the state district court raising the following claims for relief: (1) denial of counsel of choice; (2) the admission into evidence at trial of music videos denied him his First Amendment right to freedom of expression; (3) counsel was ineffective for failing to (a) play the audio of the traffic stop; (b) challenge the admission of the music videos as a violation of the First Amendment; (c) negotiate

---

[2] State Rec., Vol. 1 of 4, minute entry dated May 23, 2011; minute entry dated May 24, 2011; minute entry dated May 25, 2011; minute entry dated May 26, 2011; verdicts dated May 26, 2011; State Rec., Vol. 3 of 4, trial transcript of May 23, 2011; State Rec., Vol. 1 of 4, trial transcript of May 24, 2011; State Rec., Vol. 2 of 4, trial transcript of May 26, 2011; State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011.

[3] State Rec., Vol. 1 of 4, Defendant's Motion for Post-Verdict Judgment of Acquittal dated June 2, 2011; Defendant's Motion for New Trial dated June 2, 2011; Defendant's Supplemental Memorandum in Support of Motion for New Trial and for Judgment of Acquittal dated July 22, 2011; minute entry dated September 11, 2011; hearing transcript of September 14, 2011.

[4] State Rec., Vol. 1 of 4, Multiple Bill dated September 14, 2011.

[5] State Rec., Vol. 1 of 4, minute entry dated November 16, 2011; hearing transcript of November 16, 2011.

[6] State Rec., Vol. 1 of 4, minute entry dated November 18, 2011; hearing transcript of November 18, 2011.

[7] State Rec., Vol. 1 of 4, Motion to Reconsider Sentence dated November 22, 2011; Order dated November 25, 2011.

[8] State v. Smith, No. 2012 KA 1560, 2014 WL 3510697 (La. App. 1st Cir. May 2, 2014); State Rec., Vol. 3 of 4.

[9] State v. Smith, 157 So. 3d 1127 (La. 2015); State Rec., Vol. 2 of 4.

a plea agreement; (d) move to exclude the testimony of Jason Pierce and properly impeach his trial testimony; (e) impeach Trooper Mason regarding prior inconsistent statements made during the hearing on the motion to suppress; (4) prosecutorial misconduct; (5) he was prejudiced by trial court errors that occurred during eight unrecorded bench conferences which resulted in an incomplete appellate record; (6) ineffective assistance of appellate counsel.[10]  The state filed a response on September 18, 2015.[11]  On October 14, 2015, petitioner filed a request for leave to amend his application for post-conviction relief in which he alleged the following additional claims: (1) the trial court erred in admitting "other crimes" evidence and failing to instruct the jury about the limited use of the evidence; (2) the prosecution improperly vouched for the credibility of Jason Pierce by giving him immunity; (3) the prosecution knowingly allowed Jason Pierce to falsely testify; (4) ineffective assistance of counsel for failing to inform the prosecution that Smith would accept a plea offer of two years without the use of a multiple bill; (5) denial of his right of confrontation; (6) unlawful arrest based on an illegal seizure and false affidavit; (7) he was denied his constitutional right to counsel of choice; (8) ineffective assistance of counsel during the multiple bill adjudication and sentencing; (9) insufficient evidence supported his convictions; (10) constructive denial of counsel based on former defense counsel's conflict of interest; (11)

---

[10] State Rec., Vol. 2 of 4.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."  Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  That date cannot be gleaned from the state court record with respect to this filing.  Petitioner's application for post-conviction relief was notarized on June 1, 2015, however, the application did not include a certificate of service or the date on which petitioner placed the application in the prison mailing system.  However, along with his application, petitioner also submitted an undated Memorandum of Law and Facts In Support of Application for Post Conviction Relief, an undated Motion to Proceed In Forma Pauperis and proposed Order, an undated Motion for Production of Documents, and a Request for Evidentiary Hearing which includes a certificate of service dated June 30, 2015.  Id.  All of these documents, including the application for post-conviction relief, were stamped received by the trial court on July 7, 2015.  Id.  Given that the request for an evidentiary hearing accompanying the application was dated June 30, 2015, and all the documents were received on the same date, the application packet obviously was not placed in the prison mail system any earlier than that date.

[11] State Rec., Vol. 3 of 4, State's Response to Petitioner's Application for Post-Conviction Relief dated September 18, 2015.

ineffective assistance of trial and appellate counsel for failing to preserve claims and raise them on appeal.[12]  On October 15, 2015, the state district court granted petitioner's request for leave to amend his post-conviction application and ordered the state to respond.[13]  Petitioner filed an amended statement of facts on October 29, 2015.[14]  The state filed a response to the amended statement of facts on December 8, 2015, although it did not file a response to the amended application for post-conviction relief.[15]  Petitioner filed a request for production of documents on May 5, 2016.[16]  On July 22, 2016, the state district court denied petitioner's application for post-conviction relief, as amended, finding petitioner's original claim two and supplemental claim nine procedurally barred, and the rest of his claims without merit.[17]  The state district court denied the request for production of documents as moot.[18]

In the interim, on July 15, 2016, petitioner filed a petition for writ of mandamus with the Louisiana First Circuit seeking a ruling on his motion for production of documents.[19]  The Louisiana First Circuit denied relief as moot finding that the trial court had already denied the request for production of documents.[20]

On August 8, 2016, petitioner filed his writ application related to the denial of his original and amended applications for post-conviction relief.[21]  On October 17, 2016, the Louisiana First Circuit denied the writ on the showing made, explaining that petitioner's writ application failed to include various pleadings, minute entries, transcripts and other portions of the trial court record

---

[12] State Rec., Vol. 3 of 4, Request Leave to Amend Application for Post Conviction Relief filed October 14, 2015.
[13] State Rec., Vol. 3 of 4, Order Regarding Amended Post Conviction Relief Application dated October 15, 2015.
[14] State Rec., Vol. 3 of 4, Amended Statement of Facts filed October 29, 2015.
[15] State Rec., Vol. 3 of 4, State's Response to Petitioner's Amended Statement of Facts dated December 8, 2015.
[16] State Rec., Vol. 3 of 4, Request for Production of Documents filed May 5, 2016.
[17] State Rec., Vol. 3 of 4, Judgment denying Post Conviction Relief dated July 25, 2016; Reason for Judgment Denying Post Conviction Relief dated July 25, 2016.
[18] State Rec., Vol. 3 of 4, Order dated July 22, 2016.
[19] State Rec., Vol. 4 of 4, Application for Writ, 2016 KW 0982, signed July 15, 2016 (filed July 18, 2016).
[20] State v. Smith, 2016 KW 0982 (La. App. 1st Cir. Sept. 22, 2016); State Rec., Vol. 4 of 4.
[21] State Rec., Vol. 4 of 4, Writ Application, 2016 KW 1104, signed August 8, 2016 (filed August 16, 2016).

that might support his claims.[22]  The Court gave petitioner until December 12, 2016 to file a new application with the missing items.[23]

On November 21, 2016, petitioner submitted the missing documents to the Louisiana First Circuit.[24]  On February 21, 2017, the Louisiana First Circuit denied petitioner's writ application.[25] On March 15, 2017, petitioner filed a writ application with the Louisiana Supreme Court.[26]  The Louisiana Supreme Court denied relief on August 3, 2018.[27]

On October 17, 2018, petitioner filed the instant federal application seeking habeas corpus relief in which he asserts the following claims for relief:[28]  (1) insufficient evidence supported his conviction; (2) the trial court abused its discretion in denying the defense's Batson challenges to the prosecution's use of peremptory challenges to strike African American jurors (3) the trial court erred in its denial of the defense's motion in limine to exclude introduction into evidence of "Gangster rap" videos; (4) his total sentence of thirty years at hard labor was constitutionally excessive; (5) he was denied counsel of choice at the hearing relating to his post-trial motions; (6) he was denied his First Amendment right to freedom of expression and communication by entering into evidence his rap videos; (7) prosecutorial misconduct; (8) the failure to record eight bench conferences resulted in an incomplete record for appeal and the trial court failed to admonish the jury before recessing the proceedings; (9) ineffective assistance of appellate counsel for failure to properly argue insufficient evidence and for failing to raise other key issues; (10) the admission of

---

[22] State v. Smith, No. 2016 KW 1104, 2016 WL 6092939 (La. App. 1st Cir. Oct. 17, 2016); State Rec., Vol. 4 of 4.
[23] Id.; State Rec., Vol. 4 of 4.
[24] State Rec., Vol. 4 of 4, Writ Application, 2016 KW 1486, filed November 21, 2016.
[25] State v. Smith, No. 2016 KW 1486, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[26] State Rec., Vol. 4 of 4, Application for Writ, 17 KH 682, signed March 15, 2017 (filed 4/26/17).
[27] State ex rel. Smith v. State, 249 So.3d 824 (La. 2018) (per curiam); State Rec. Vol. 4 of 4.
[28] Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner signed his petition and certificate of service on October 18, 2019.  Rec. Doc. 1, p. 14.  Many of petitioner's claims are duplicative and/or overlapping, however, they are listed here in the order they were listed in his habeas application.

"other crimes" evidence without notice and a hearing and a jury instruction violated his right to a fair trial; (11) prosecutorial misconduct based on improper vouching for the credibility of a key witness; (12) prosecutorial misconduct based on the knowing presentation of false testimony; (13) and (14) he received ineffective assistance of counsel when his counsel failed to tell the prosecution that he would accept a two year deal if placed in writing or orally told by the prosecution; (15) denial of his right of confrontation of witnesses; (16) illegal arrest based upon the false affidavit of Trooper Mason who also testified falsely at the suppression hearing; (17) denial of his constitutional right to counsel without notice and consent; (18) ineffective assistance of counsel in failing to file or orally raise objections to the offenses underlying his habitual offender status; (19) the trial court erroneously denied his motion for post-judgment acquittal where the entirety of the evidence, both admissible and inadmissible, was insufficient to support his convictions; (20) his trial counsel had a conflict of interest preventing her from filing post-trial motions based on her failure to preserve claims which resulted in a constructive denial of counsel; and (21) both trial counsel and appellate counsel were ineffective by failing to preserve claims and raise them on direct appeal.

The state initially filed a response arguing that the application should be dismissed as untimely.[29] The state did not address the merits of any of the claims. Petitioner filed a reply claiming that the state had miscalculated the tolling time based on incorrect dates.[30] By order dated October 28, 2019, the undersigned found that the state's timeliness argument included multiple legal and mathematical errors and that a volume of the trial transcript was missing from the state court record.[31] The undersigned directed the state to file a supplemental response

---

[29] Rec. Doc. 12.
[30] Rec. Doc. 14.
[31] Rec. Doc. 17.

reassessing its timeliness argument, raising any other applicable procedural objections, and addressing the merits of each of petitioner's claim for relief.[32]  The order also directed the state to supplement the record with a copy of the trial transcript of May 25, 2011.[33]

On January 21, 2020, the state filed its supplemental response in which it now concedes that petitioner's petition is in fact timely.[34]  The state further concedes that all of petitioner's claims are exhausted.  The state argues that petitioner's claims are meritless, although, with regard to many of the claims, it fails to cite to any law supporting its position.

## II. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state courts' decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The

---

[32] Id.
[33] Id.
[34] Rec. Doc. 20.

7

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state courts' decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 134 S. Ct. 1697, 1705 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at

hand, then by definition the rationale was not clearly established at the time of the state-court decision.    AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id., at 1706 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White, 134 S. Ct. at

1701.

### III. Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this

case as follows:

> On December 23, 2010, Louisiana State Trooper, Christopher Mason, was
> stationed in his vehicle observing traffic while he was parked in the median of U.S.
> Highway 90 near LA Highway 311 in Terrebonne Parish.  As Trooper Mason
> noticed a car traveling at a high rate of speed, he activated his radar and it indicated
> the car was going 89 miles-per-hour in a 70 miles-per-hour speed zone.  He then
> made a traffic stop on the shoulder of Highway 90.  After exiting his vehicle,
> Trooper Mason approached the driver's side of the car and advised the driver to exit
> and step to the rear of the car.  Trooper Mason observed four occupants in the car.
> After exiting the car, the driver put his hands up in the air without being requested.
> Trooper Mason testified that this raised his suspicions, so he restrained the driver.
> The driver was identified as the defendant, Clyde Smith.  The defendant told
> Trooper Mason that he was coming from Port Arthur, Texas.  Trooper Mason then
> called for another trooper to assist him at the scene.  Trooper Mason spoke with the
> other occupants of the car and was told that they were coming from Houston, Texas.
>     Louisiana State Trooper Michael Stewart later arrived on the scene.
> Trooper Stewart observed the passengers in the car and briefly spoke to Trooper
> Mason. The passenger in the front seat was identified as Ashley DeHart.  She
> indicated that she was the owner of the car.  Ms. DeHart consented to a search of
> the vehicle, which was then conducted by Trooper Stewart.  A black backpack was
> removed from the car and searched.  Inside of the backpack were multiple bottles
> of medication, flyers and directions to numerous doctors' offices and pharmacies
> in the Houston area.  Contained in the bottles were Hydrocodone, Alprazolam,
> Carisoprodol and other pills determined to be vitamins and a laxative.  Some of the
> bottles were labeled as written for the defendant, and others were labeled as written

for two other occupants of the car, namely Ms. DeHart and Jason W. Pierce.  The owner of the backpack was determined to be the defendant.  The defendant was arrested and transported to State Police Troop C.

State witness Jason Pierce testified he and the defendant had gone to Texas on December 23, 2010 to obtain prescription medication for the purpose of distribution.  He and the defendant saw different doctors and purchased medication at multiple pharmacies.  Pierce testified he and the defendant had been to Texas on prior occasions to buy pills.

The defendant testified at his trial.  He claimed he had been shot in the face at an earlier time from which he suffers pain.  He claimed he had a legal prescription and that he took hydrocortisone for his pain, and either Soma or Xanax for anxiety.  He also claimed that he only knew that his medication was in his backpack when he was initially detained.  He further claimed the instant trip was the only time he had gone to Texas with Jason Pierce and Ashley DeHart.[35]

## IV.    Petitioner's Claims[36]

## A.  Sufficiency of the Evidence

Petitioner's first claim is that there was insufficient evidence to prove that he was in fact guilty of the crimes of which he stands convicted.  He contends that the state failed to exclude the possibility that he was being truthful when he testified that he had no intention to sell the pain medications which had been obtained from a licensed medical practitioner in Texas.  He claims Jason Pierce's testimony was self-serving and uncorroborated.  On direct appeal, the Louisiana First Circuit Court of Appeal denied his claim relating to the sufficiency of the evidence holding:

> In assignment of error number one, the defendant argues that there was insufficient evidence to convict him of possession with intent to distribute the medications found in the car.  His argument is that he had lawfully obtained the medications from a licensed medical practitioner and was returning to his residence at the time of his arrest.  The defendant contends that the only evidence showing his intent to distribute came from the testimony of Jason Pierce and from statements made by the defendant in a rap video performance.
>
> The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the state proved the essential elements of the crime and the identity of the perpetrator of that crime beyond a

---

[35] Smith, 2014 WL 3510697, at *1-2 ; State Rec., Vol. 2 of 4.
[36] As previously stated, some of petitioner's claims are duplicative and/or overlap.  While he includes boilerplate law, he oftentimes does not include any facts supporting his claims.  For ease of analysis, the undersigned addresses some of petitioner's claims together and in a different order than which they were presented.

reasonable doubt. When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove, in order to convict," every reasonable hypothesis of innocence is excluded. State v. Wright, 98–0601 (La. App. 1st Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99–0802 (La. 10/29/99), 748 So.2d 1157, & 2000–0895 (La. 11/17/00), 773 So2d 732 (quoting La. R.S. 15:438). When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Wright, 730 So.2d at 487.

The instant convictions arise under La. R.S. 40:967(A) and La. R.S. 40:969(A). Under those statutes, it shall be unlawful for any person knowingly or intentionally to possess with intent to distribute any controlled dangerous substance classified under certain schedules listed under La. R.S. 40:964.

After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in the light most favorable to the state, could find the evidence proved beyond a reasonable doubt, as to the exclusion of every reasonable hypothesis of innocence, all of the elements of possession with intent to distribute Hydrocodone and Alprazolam and attempted possession with intent to distribute Carisprodol, and the defendant's identity as the perpetrator of those offenses. The jury rejected defendant's claim of lack of intent to distribute the substances found in his backpack. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls. Therefore, the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La. 1984). The defendant has shown no such hypothesis exists in this case.

The guilty verdicts indicate the jury accepted the testimony of the state's witness, Jason Pierce, over that of the defendant. An appellate court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. The fact finder may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of evidence, not its sufficiency. State v. Lofton, 96–1429 (La. App. 1st Cir. 3/27/97), 691 So.2d 1365, 1368, writ denied, 97–1124 (La. 10/17/97), 701 So.2d 1331. After review of the evidence presented, this Court cannot say the jury's determination was irrational under the facts and circumstances presented. See State v. Ordodi, 2006–0207 (La. 11/29/06), 946 So.2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 2007–2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

This assignment of error is without merit.[37]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[38]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state courts' decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, petitioner has not made such a showing.

Claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' "  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).  Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must

---

[37] State v. Smith, No. 2012 KA 1560, 2014 WL 3510697, at *2-3 (La. App. 1st Cir. May 2, 2014); State Rec., Vol. 3 of 4.
[38] Smith, 157 So. 3d at 1127; State Rec., Vol. 2 of 4.

nonetheless uphold." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). Moreover, as the United States Fifth Circuit Court of Appeals has observed: "[A] state prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence. The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law." Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted). Further, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Additionally, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does not apply in federal habeas corpus proceedings; in these proceedings, only the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Petitioner was charged with and convicted of possession with the intent to distribute Alprazolam (Xanax) and possession with the intent to distribute Hydrocodone (Lortab) in violation of La. Rev. Stat. §§ 40:967(A) and 40:969(A).  He was also charged with possession with the intent to distribute Carisoprodal (Soma) in violation of La. Rev. Stat. § 40.969(A), but was convicted of the lesser offense of attempted possession with the intent to distribute it.

Under La. Rev. Stat. § 40:967(A)(1), it shall be unlawful for any person knowingly or intentionally to possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance classified in Schedule II, such as Hydrocodone.  Under La. Rev. Stat. § 40:969(A)(1), it is unlawful for any person knowingly or intentionally to possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance classified in Schedule IV, such as Alprazolam and Carisoprodal.

To support a conviction for possession of a controlled dangerous substance with intent to distribute it, the state is required to prove both possession and specific intent to distribute it.  See State v. Young, 764 So.2d 998, 1006 (La. App. 1st Cir. 2000).

Under La. Rev. Stat. § 14:27(A), an attempt is defined as follows:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

To be found guilty of attempted possession with intent to distribute Carisoprodal (Soma), a defendant must have a specific intent to commit that crime and do or omit an act for the purpose of and tending directly toward the accomplishing of his object.  See La. Rev. Stat. § 14:27.

Narcotics offenses involving possession with intent to distribute require proof of specific intent.  State v. Elzie, 343 So.2d 712 (La. 1977); State v. Williams, No. 2012 KA 1600, 2013 WL

1792646, at *3 (La. App. 1st Cir. Apr. 26, 2013). Louisiana Revised Statute § 14:10(1) defines specific criminal intent as that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." The intent to distribute may be established by proving circumstances surrounding a defendant's possession which give rise to a reasonable inference of intent to distribute. State v. Ramoin, 410 So.2d 1010 (La. 1981). Some factors used by Louisiana courts to determine whether circumstantial evidence is sufficient to prove an intent to distribute include (1) whether the defendant ever distributed or attempted to distribute the drug; (2) whether the drug was in a form usually associated with possession for distribution to others; (3) whether the amount of drug created an inference of an intent to distribute; (4) whether expert or other testimony established that the amount of drug found in the defendant's possession is inconsistent with personal use only; and (5) whether there was any paraphernalia, such as baggies or scales, evidencing an intent to distribute. State v. Hearold, 603 So.2d 731, 735 (La. 1992). In the absence of circumstances from which an intent to distribute may be inferred, mere possession of a drug does not amount to evidence of intent to distribute, unless the quantity is so large that no other inference is possible. Id.

Smith primarily focuses on the specific intent element with regard to distribution, as thoroughly addressed by the court of appeal. As previously stated, he argues that the state failed to exclude the possibility Smith was being truthful when he testified that he had no intention of selling the drugs. He argues that his testimony that he needed the pills for his own pain was supported by his medical records and the testimony of his girlfriend, Pontiff. He also contends that Pierce's testimony is not reliable.

In this case, the jury heard testimony from Trooper Christopher Mason that he observed a car traveling at a high rate of speed, 89 miles per hour in a 70 mile per hour zone according to his radar detection, on December 23, 2010, at 12:30 a.m.[39]  He initiated a traffic stop and requested the driver (Smith) to exit the vehicle.[40]  There were three passengers in the car.[41]  Trooper Mason testified that he became suspicious when Smith placed his hands in the air without being directed to do so, as Trooper Mason had never had someone do that before, so he restrained Smith.[42]  Upon questioning, Smith told him he had been visiting with "his people" in Texas near Port Arthur.[43]  Several passengers told Mason they were coming from Houston.[44]  Due to the presence of the passengers and their conflicting stories, Trooper Mason called for backup, and Trooper Stewart arrived.[45]  A video of the stop was played for the jury.[46]

Trooper First Class Michael Stewart testified that he arrived as back up for Trooper Mason who explained to him the reason for the traffic stop and his initial observations.[47]  One of the passengers, DeHart, identified herself as the owner of the vehicle and consented to a search.[48]  Stewart located a backpack with prescription bottles properly packaged and labeled in Smith and Pierce's names.[49]  Stewart explained:

> Also inside the backpack was numerous flyers, paperwork and everything indicating multiple prescription places where you can purchase prescriptions, and also doctor offices along with, there was also, also inside the vehicle a – I want to say compound, I don't know the exact make or model it was, but a compound type GPS device that was also located in the vehicle.  Once I seen that, and based on my previous experience being a narcotics agent, that's when I reached out and had the

---

[39] State Rec., Vol. 2 of 4, trial transcript of May 24, 2011, pp. 263-264.
[40] Id. at p. 265.
[41] Id.
[42] Id., at pp. 265, 283.
[43] Id., at p. 265.
[44] Id., at pp. 265, 285, 287.
[45] Id., at 265, 267.
[46] Id., at pp. 280-81.
[47] Id., at p. 289.
[48] Id., at p. 290.
[49] Id., at pp. 291-92.

troop contact our on-call narcotics agent since his resources will be more appropriate with furthering the investigation, rather than the resources that I had to me being assigned to patrol.[50]

Also during the search of the vehicle, two bottles of prescription medications in DeHart's name were located on the floorboard.[51] Stewart patted down Pierce and located several Soma (Carisoprodal) pills in his pocket.[52] They also located some vitamins, although they did not know what the pills were until they were tested and identified, and a yellow folder with medical records.[53] Stewart testified that based on the backpack he believed Smith was in possession of other people's medications, and based on the flyers, and the information gained from the GPS, and his narcotics experience, he believed Smith was "doctor shopping," which he explained was obtaining large amounts of prescription medications and selling them on the street.[54] The troopers took custody and inventoried the evidence.[55] Stewart recalled that there was a juice container and empty cups that were not seized.[56]

Trooper Craig Rhodes, a narcotics investigator, testified that Trooper Stewart gave him the evidence seized from the vehicle search.[57] He described a large amount of prescription pills that were sent to the crime lab in Baton Rouge for analysis.[58] Rhodes identified the backpack and the large amount of paperwork that was inside.[59] He explained there were prescription bottles for Hydrocodone, Xanax, and Soma in the names of Smith and Pierce.[60] He described a worn yellow folder which included paperwork from pharmacies and doctors' offices and pain management

---

[50] Id., at p. 291.
[51] Id., at p. 292.
[52] Id., at p. 295.
[53] Id., at p. 297.
[54] Id., at pp. 294, 299.
[55] Id., at p. 292.
[56] Id., at p. 293.
[57] Id., at pp. 304, 306-07.
[58] Id., at p. 304.
[59] Id., at p. 307.
[60] Id.

clinics, directions to the clinics and pharmacies, notes indicating which ones accepted Louisiana or out-of-state patients, coupons offering discounts, coupons for referring other patients, and some medical records.[61]  The medical records included paperwork from Terrebonne General Medical Center and Radiological Imaging Center.[62]  There was a handwritten receipt from a pharmacy dated December 16, 2010, for $130 cash, an application for a Texas identification card or driver's license, a list of pharmacies with directions, and handwritten notes indicating whether they accept out of state patients.[63]

Rhodes explained there was a bag from BVM Pharmacy in Houston, Texas in the name of Smith, which included a prescription for Ibuprofen, a copy of a Texas identification card in Smith's name, a receipt for daily multivitamins, a receipt for forty Alprazolam (Xanax) pills, and a receipt for 120 Hydrocodone (Lortab) pills all authorized by Dr. Howard Barber.[64]  Rhodes next testified regarding papers that are included when a prescription is filled that provide information about the medication and possible side effects.  All four of the papers were dated December 22, 2010, and were in Pierce's name and were for Hydrocodone, Alprazolam, Ibuprofen, and multivitamins.[65]  Rhodes described business cards for medical clinics, a paper titled "Pharmacy Call List" which listed 24 pharmacies, none of them considered to be chains, that had the addresses, telephone numbers and notes whether they accept out-of-state patients.[66]  Rhodes testified that he recognized some of the pharmacies from other investigations.[67]  A second list was titled "Pharmacies that have Filled Prescriptions for us in the Past" and seven of the pharmacies on the list had been

---

[61] Id., at p. 308.
[62] Id., at p. 309.
[63] Id., at pp. 309, 311.
[64] State Rec. Supp Vol. 1 of 1, trial transcript of May 25, 2011, pp. 7-8.
[65] Id., at pp. 8-9.
[66] Id., at p. 10.
[67] Id.

circled.[68]  The evidence seized from the car also included many other pharmacy lists for different doctors and medical clinics.[69]  Rhodes identified papers indicating that Smith was examined at Quality Care Medical on December 14, 2010, and Outpatient Pain and Wellness Center Clinic on December 16, 2010, both in Houston, Texas.[70]

Rhodes identified receipts from Pro Care Pharmacy for prescriptions for Ashley DeHart for Hydrocodone and Carisoprodal (Soma) that were prescribed by Physician Assistant Omamogho and the prescription bottles of medications that were filled on December 22, 2010.[71]  He identified a bottle of Hydrocodone pills prescribed for Pierce prescribed by Physician's Assistant Rebeca Dudley and filled by Pro Care Pharmacy and bottles of Hydrocodone and Alprazolam (Xanax) pills for Smith prescribed by Dr. Barber and filled by BVM Pharmacy in Houston on December 22, 2010.[72]  He confirmed both Pierce and Smith's pills were found in Smith's backpack.[73]  Rhodes testified he recognized Dr. Barber's names from other investigations.[74]

Trooper Rhodes testified that he interviewed Pierce, DeHart, Pontiff and Smith and arrested everyone but Pontiff.[75]  Rhodes explained that the laws in Texas are not as stringent as those in Louisiana when it comes to obtaining certain prescription medications and that the pain clinics in Houston advertise and cater to people in Louisiana and other states so people go there to obtain the "unholy trinity" or "Houston cocktail" of Hydrocodone, Soma and Xanax.[76]  He explained that, generally, the drug runners were not taking any major steps to conceal the medications when they return to Louisiana and that law enforcement finds it in luggage, bags, purses, knapsacks, on

---

[68] Id., at p. 11.
[69] Id., at pp. 12-14.
[70] Id., at pp. 15-17.
[71] Id., at pp. 20-21, 31-33.
[72] Id., at pp. 26-30.
[73] Id., at p. 30.
[74] Id., at p. 29.
[75] Id., at p. 34.
[76] Id., at pp. 39-40.

the seat of the car or in the trunk, but that some people will attempt to hide the medications in a false compartment like a vegetable can that has a false bottom.[77]

He explained that, based on personal experience, a single Hydrocodone or Xanax pill sells for five to seven dollars in Terrebonne Parish, with Soma sold a little cheaper at three to five dollars.[78] Rhodes explained that he comes across "doctor shoppers" as little as twice a month to as much as twice a week.[79] He reiterated that, during his investigations, he had heard of Dr. Howard Barber, Hillcroft Clinic, and Omamogho.[80]

Trooper Rhodes testified that he reviewed Smith's medical records that showed he had a previous gunshot wound to his neck, but that, during his interview, Smith complained to him of back problems, but could not answer which vertebrae were in question.[81] Rhodes explained that the troopers made up the name of a condition, "discombobulation," and that Smith claimed to be suffering from it.[82] Given his interview, the evidence discovered from the traffic stop and the other interviews, Trooper Rhodes felt that, while Smith had medical documentation for a medical condition, he was diverting the prescriptions for illegal means.[83] He explained that, in his experience, he had not come across a single person who had gone to Texas to obtain medication for legitimate reasons, but rather they had done it for the sole and express purposes of bringing the pills back to Louisiana and distributing them on the streets.[84]

Jermaine White testified that he and Smith had made some rap music together and that they were part of the RICO Gang rap group.[85] White testified that they remixed a song by Rick Ross

---

[77] Id., at p. 41.
[78] Id., at pp. 42-43.
[79] Id., at p. 44.
[80] Id., at p. 45.
[81] Id., at pp. 54-55.
[82] Id., at p. 55.
[83] Id.
[84] Id., at .p 65.
[85] Id., at pp. 74, 76-78.

from Miami called "BMF Free Style" and that they changed some of the words, made a video and uploaded it to YouTube.[86]  The video was played for the jury.[87]  White admitted that some of the lyrics they rapped were about him and Smith "going to Texas to get it from the same people, that RICO Gang selling pills like it's legal."[88]  He further admitted that Smith rapped, "I got my receipts, I been doctor shopping, another trip to Texas bitchy, I'm going doctor shopping."[89]  White, however, claimed that the lyrics were "just entertainment" and that they personally did not do those things.[90]  White admitted that they recorded a "Behind the Scenes" video shot in Daniel Turner Trailer Park and uploaded it to YouTube.[91]  The video was played for the jury.[92]  In the video, they say, "We really do the shit we talk about, we really take those trips," but White claimed that they just traveled concerts and that it was all "promotion."[93]

Jason Pierce testified he had taken multiple trips to Houston with Smith.[94]  According to Pierce, several months before the traffic stop, Smith asked Pierce and his girlfriend, DeHart, if they were interested in making extra money by going to doctors to obtain pills.[95]  They would visit doctors, obtain prescriptions, get them filled, and turn them over to Smith, who gave Pierce and DeHart money to pay for the doctor visits and the prescriptions.[96]  Pierce explained that it was easier to obtain the medications in Texas because the pharmacies were not online and no one could check the dates to see when and where prescriptions were filled.[97]  He explained that they were

---

[86] Id., at pp. 78-81.
[87] Id., at pp. 81-84.
[88] Id., at p. 83.
[89] Id., at p. 84.
[90] Id., at pp. 83-85.
[91] Id., at pp. 87-88.
[92] Id., at p. 89.
[93] Id., at pp. 89-90.
[94] Id., at pp. 112-113, 135.
[95] Id., at p. 118.
[96] Id., at p. 119.
[97] Id., at p. 117.

trying to obtain Hydrocodone, Xanax and Soma.[98]  Pierce further explained that both he and Smith were prescribed those medications ninety percent of the time, and that Smith paid Pierce in pills.[99] According to Pierce, they made trips whenever they had money.[100]

Pierce testified that on December 22, 2010, Pierce, Smith, DeHart, and Pontiff left Louisiana for Texas around 12:00 or 2:00 a.m. to get prescription medication to distribute.[101]  They arrived in Houston in the early morning and waited for the doctors' offices to open.[102]  Everyone but Pontiff, who was not of age, saw doctors.[103]  Pierce explained that they all saw separate doctors and that he did not see Dr. Barber because he had seen him the week before, but rather went to Dr. Dudley and another doctor.[104]  DeHart went to Hillcroft Clinic, which Pierce and Smith had been to in the past.[105]  He believed DeHart and Smith also saw two doctors that day.[106]

Pierce testified that they went to different pharmacies to have the prescriptions filled based on the doctors or if a pharmacy ran out of medication.[107]  He also explained the pharmacies only allowed refills once a month so they would have to use different pharmacies.[108]

Pierce identified the backpack and the medications as belonging to Smith.[109]  Pierce claimed that they hid some of the Hydrocodone, Xanax and Soma in a hidden compartment in the bottom of a pineapple juice container because they didn't want to be caught doctor shopping.[110]  Pierce testified that the intent was to sell the medication with Smith getting the profits and Pierce getting

---

[98] Id.
[99] Id., at p. 118.
[100] Id., at 114.
[101] Id., at p. 114.
[102] Id.
[103] Id., at p. 115.
[104] Id., at p. 116.
[105] Id., at pp. 116-117, 123-124.
[106] Id., at p. 124.
[107] Id., at p. 120-121.
[108] Id., at p. 123.
[109] Id., at p. 121.
[110] Id., at pp. 124-26.

his payment in Hydrocodone pills.[111]   The night they were stopped in Terrebonne Parish, they were on their way to Lafourche Parish to sell some of the medications to a friend of Pierce.[112]   The plan was to sell 100 pills of the 330 to 350 total pills, for five to six dollars each and give the money to Smith.[113]

Pierce claimed Smith's lyrics in his rap songs were true.[114]   Pierce testified that he had been threatened prior to trial by persons, including Smith.[115]   He claimed he was called a "dead man" and that Smith called him a "rat" and a "snitch" and that he was going to "smash" him.[116]   Pierce admitted that, after the threats, he sent a note to Smith that "they were trying to put words in [his] mouth," but claimed that the reason he wrote the note was because he was scared.[117]

The defense presented the testimony of Christian Pontiff, Smith's fianceé, who testified that Smith had relatives in Port Arthur Texas.[118]   She testified that he had a bullet fragment in his neck and is always in pain.[119]   She testified that on December 22, 2010, she Smith, Pierce, and DeHart went to Texas.[120]   Pontiff claimed that she planned to shop at the Houston Mall, but that Pierce and DeHart kept going to different doctor offices.[121]   Pontiff claimed that Pierce and DeHart dropped her and Smith off at a doctor's office while they went to different doctors.[122]   After several hours, Pierce and Dehart picked them up and had the prescriptions filled.[123]   By that time, there was no time left for shopping so they drove back to Louisiana.[124]   Pontiff testified that Pierce made

---

[111] Id., at pp. 126-27.
[112] Id., at pp. 129-130.
[113] Id.
[114] Id., at p. 131.
[115] Id., at p. 132.
[116] Id., at pp. 132, 147-148.
[117] Id., at pp. 150-154.
[118] Id., at p. 170.
[119] Id., at pp. 170-171.
[120] Id., at p. 171.
[121] Id.
[122] Id.
[123] Id., at pp. 172-73.
[124] Id., at p. 173.

many calls on the trip back to Louisiana in order to sell his medications.[125] She claimed that Smith drove because DeHart and Pierce were both taking a lot medication.[126] On cross-examination, she claimed that Smith had been to the doctor only once in Houston, Texas on December 22, 2010, and that his other visits were to family in Port Arthur.[127] Pontiff claimed and she and Smith were engaged on December 16, 2010, in Louisiana, but acknowledged that a date on a doctor record showed Smith had been in Houston that day.[128] Pontiff further claimed that she and Smith were going to move to Port Arthur, Texas, after the new year to live with one of his aunts.[129]

Clyde Smith testified in his own defense.[130] He claimed he had a mental disorder which caused him to hear voices and suffered chronic pain from a bullet in his neck.[131] He also claimed to have back spasms as a result of falling after he had been shot and alleged he had been treated for his back condition in Texas.[132] Smith claimed he had legal prescriptions for Hydrocodone and Xanax from a licensed practitioner and a licensed pharmacy in Houston, and that he needed the medications due to pain in his face, neck, and back spasms.[133] According to Smith, he was living in Texas from November 13, 2010 until December 16, 2010, when he returned to Louisiana to pick up his Social Security check.[134] Smith claimed Pierce called him on December 21, 2010, and asked if he wanted to go to Texas with him to pick up some prescription medications, on the condition that Smith pay for the gas.[135] Smith claimed he told Pierce he did not have the money

---

[125] Id., at p. 174.
[126] Id.
[127] Id., at p. 178.
[128] Id., at pp. 178-79.
[129] Id., at pp. 184 186.
[130] State Rec., Vol. 2 of 4, trial transcript of May 26, 2011, pp. 11-70.
[131] Id., at p. 12.
[132] Id., at p. 13.
[133] Id., at 14, 16.
[134] Id., at pp. 14, 16.
[135] Id., at pp. 14-15.

for gas and was not sure he had money for the prescription.[136]  Smith further claimed he placed some bets on some football and basketball games and won $400 and called Pierce back to say he could pay for gas.[137]  Smith admitted that he had been to doctor visits on December 14 and 16, 2010, but claimed that he did not have his medical records and he was not prescribed any medication, so he returned to Houston on December 22, 2010, to get medication because it had been longer than thirty days since his last refill.[138]  He testified that he took four "Hydrocortisone" and two Xanax a day.[139]

Smith admitted that they left for Houston at midnight on December 22, 2010, in DeHart's car and arrived around seven in the morning.[140]  Smith brought his medical records and went to see Dr. Barber, who prescribed him 40 Xanax and 120 "Hydrocortisone" pills.[141]  He and Pontiff were stranded several hours while Pierce and DeHart visited two doctors each, after which they were picked up, and they all got their prescriptions filled at different pharmacies.[142]  After eating dinner, they began their return trip to Louisiana, but Smith claimed DeHart was driving recklessly and was under the influence of medications so Pierce took over driving.[143]  Smith claimed that Pierce was also driving recklessly so Smith took over as the driver of the vehicle.[144]  During the drive, Pierce and DeHart made phone calls to inform people they would call when they got to Morgan City.[145]  Pierce told Smith that if he needed some money, he could sell some pills to Pierce's clients, but Smith testified that he declined to do so.[146]

---

[136] Id., at p. 15.
[137] Id., at pp. 15, 17, 62.
[138] Id., at p. 15.
[139] Id., at pp. 16-17.
[140] Id., at pp. 17-18
[141] Id., at pp. 19-21.
[142] Id., at p. 21.
[143] Id., at pp. 22-24.
[144] Id., at p. 24.
[145] Id., at p. 25.
[146] Id., at p. 34.

26

Smith testified that his medication was in his backpack and that DeHart and Pierce's medications were in the back seat with them.[147]   He assumed that Pierce put his medication in the backpack after Smith was pulled over and removed from the car.[148]   Smith claimed that he put his hands up when he exited the car to show he was not resisting and did not pose a threat.[149]   He claimed he told the troopers that he was coming from the doctor in Houston and denied telling them he was coming from Port Arthur.[150]   Smith further denied making more than one trip to Houston with Pierce and DeHart, although he admitted that he made a few trips to Texas with Jermaine White.[151]

Smith explained that he wanted to be a rapper so he and his group would mix other rap songs and post them on YouTube hoping that they would get an offer.[152]   He claimed the lyrics in their songs were not true, but rather were just for entertainment.[153]   He denied ever threatening Pierce.[154]

To the extent that petitioner is arguing that the jurors should not have found the state's witnesses credible, and should have believed his testimony as well as that of Pontiff, that simply is not for this Court to say.   Credibility determinations are the province of the jurors, and a federal habeas court generally will not grant relief on a sufficiency claim grounded on such matters of credibility.   See Schlup v. Delo, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) ( "[U]nder Jackson [v. Virginia] 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) ], the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v.

---

[147] Id., at p. 26.
[148] Id., at pp. 30 59.
[149] Id., at p. 27.
[150] Id., at p. 28.
[151] Id., at pp. 54-55.
[152] Id., at p. 36.
[153] Id., at pp. 37-38.
[154] Id., at pp. 41-42.

<u>Dretke</u>, 398 F.3d 691, 695 (5th Cir.2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); <u>McCowin v. Scott</u>, No. 93–5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the <u>Jackson</u> standard for habeas relief."); <u>Phillips v. Cain</u>, Civ. Action No. 11–2725, 2012 WL 2564926, at *14 (E.D. La. April 11, 2012), <u>adopted</u>, 2012 WL 2565025 (E.D. La. July 2, 2012); <u>Picou v. Cain</u>, Civ. Action No. 06–6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, for the reasons explained by the Louisiana First Circuit Court of Appeal, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*.  Therefore, petitioner cannot show that the state courts' decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under these doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

### B.  Batson

Petitioner next claims that the trial court abused its discretion in denying his <u>Batson</u> challenges when the prosecution excluded African American jurors in a racially discriminatory manner.

Petitioner raised this issue on appeal.  The Louisiana First Circuit found as follows:

> In assignment of error number two, the defendant argues the trial court abused its discretion in denying the defendant's <u>Batson</u> challenge to the prosecution's exclusion of African–American jurors.  In <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court adopted the following three-step analysis to determine whether or not the constitutional rights of a defendant or prospective jurors had been infringed by impermissible discriminatory practices.  First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.

Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  State v. Elie, 2005–1569 (La.7/10/06), 936 So.2d 791, 795.

The Batson explanation does not need to be persuasive.  Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court.  Reasons offered to explain the exercise of peremptory challenges should be deemed race-neutral unless a discriminatory intent was inherent in those reasons.  Elie, 936 So.2d at 795–96.

For a Batson challenge to succeed, it is not enough that a racially discriminatory result be evidenced; rather, that result must ultimately be traced to a racially discriminatory purpose.  Thus, the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes.  State v. Green, 94–0887 (La. 5/22/95), 655 So.2d 272, 287.

Initially, we note a problem with the record in addressing this issue on appeal.  There is no designation of the race of the potential jurors except for a few comments by the attorneys in voir dire and arguments to the court.  The only instance where the potential juror's race was recognized is the defendant's attorney noting in a discussion with the court for the record that prospective juror Lonigan Valentine was black.  There was also a dialog during voir dire in which the prosecutor spoke with prospective jurors.  The following exchange took place:

> Mr. Degate (The prosecutor):  The last question I have is a difficult subject but it's one that I'm duty bound to discuss, and that's the issue of race. Obviously I'm a white prosecutor and the defendant appears to be a black male.  Because of that situation, because of race, the question that I have is whether or not that will cause you any biases in your decision whatsoever? Maybe you feel that the [s]tate is out to get the defendant because he is of a particular race.  And I apologize for having to ask this question, but I have to do it to make sure I can get a fair jury. So, Mr. Ray, since I picked on you earlier you appear to be an African–American male.  Would that cause you
>
> Mr. Ray (juror): I can take it.
>
> Mr. Degate: Would that cause you any biases whatsoever?
>
> Mr. Ray: No.
>
> Mr. Degate: All right.  Ms. Burns?
>
> Ms. Burns (juror): No.
>
> Mr. Degate: All right.  Mr. Celestine?
>
> Mr. Celestine (juror): No.

Mr. Degate: All right.  And I take you all at your word.  The flip side, anybody who's not an African–American on the jury would that cause you any biases in this case?"

(No responses)

Despite the difficulties in determining the racial makeup of the jury venire, we note that the trial court indicated that it would assume for the purposes of the challenge that there was a pattern of striking black potential jurors.  This ruling was made at the time of the first <u>Batson</u> challenge.  When we look at the trial court's statement, coupled with the portions of the record shown above, we can conclude the first prong of the <u>Batson</u> requirements has been met.  The state was then required to provide race-neutral explanations for using peremptory challenges when objections were made by the defendant.

The defendant has argued the use of peremptory challenges on prospective jurors Nakita Williams and Lonigan Valentine were improper.  Ms. Williams and Mr. Valentine were included on the second panel called for voir dire.  Nakita Williams responded to questioning by the court that she was 25 years old, unmarried and worked in customer service at Home Depot.  In response to questions from the prosecutor, Ms. Williams indicated her personal beliefs would give her reservations about judging the guilt or innocence of someone.  When the trial court asked her if she might actually vote not guilty even if the state proved its case, she answered "I might ."  After further questioning, she indicated she would follow the law presented to her by the court.  When the state exercised a peremptory challenge, a <u>Batson</u> objection was made by the defendant.  After being asked by the trial court to give a race-neutral reason for why a peremptory challenge was being used against Ms. Williams, the state indicated it was because of her answer to the question of whether she would enter a verdict of guilty.  The court denied the objection and found the challenge to be race-neutral, saying "He (the prosecutor) says it's because of her hesitancy in her willingness to convict the defendant even if the [s]tate proves its case beyond a reasonable doubt because of her initially expressed fears that defendant might have to go to jail and her initially expressed reservations about judging people."

Lonigan Valentine stated he worked for Gas & Supply in Houma as a truck driver.  He was 50 years old and unmarried.  In the voir dire conducted by the state, the jury panel was asked "Has anybody had a family member or someone that you would consider close to you, or yourself, arrested for a crime?"  The state then further inquired "Anyone else ever been arrested for a crime personally or issued a misdemeanor summons, other than a traffic ticket?"  Mr. Valentine did not respond to either of these questions.  The defendant made a <u>Batson</u> objection when the state excused Mr. Valentine with a peremptory challenge.  The race-neutral reason given for the challenge was that Mr. Valentine had not been truthful when he failed to offer that he had been charged with simple battery and issued a summons in 2009.  During a bench conference, a review of the District Attorney's records was done by the trial court and counsel for the defendant.  The court and both parties noted

30

the existence of the charge and summons. After this review, the trial court found this to be a reasonable basis for the exercise of the peremptory challenge.

We find the trial court did not abuse its discretion in denying the <u>Batson</u> challenges against prospective jurors Williams and Valentine. The defendant failed to prove purposeful discrimination, and the state articulated verifiable and legitimate explanations for striking these minority prospective jurors.

The defendant's brief also discusses the exercise of peremptory challenges by the state to Ms. Geraldine Boudreaux and two additional unidentified African–American jurors. The record shows no <u>Batson</u> objections were made by the defendant to any potential jurors other than Ms. Williams and Mr. Valentine. Defendant admits this in his own brief. However, we recognize that a <u>Batson</u> objection is timely if it is made before the jury is empaneled and sworn . <u>State v. Green</u>, 655 So.2d at 285; <u>State v. Williams</u>, 524 So.2d 746 (La.1988) (per curium); <u>see also</u> La.Code Crim. P. art. 795B(1) (mandating that "[p]eremptory challenges shall be exercised prior to the swearing of the jury panel"). The issue of the timeliness of <u>Batson</u> objections is difficult because a pattern of discrimination may not become evident in early stages of voir dire. While counsel should preferably make the objection as soon as the discriminatory pattern is evident, contemporaneous objections are not always feasible because a pattern of invidious discrimination may not be evident until jury selection is complete. <u>State v. Duncan</u>, 99–2615 (La.10/16/01), 802 So.2d 533, 546, <u>cert. denied</u>, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002).

In the instant case, the defendant made a "global objection"[1] after the state used a peremptory challenge on Ms. Williams. Our review of the record shows counsel for defendant asked no individual questions to Ms. Boudreaux in voir dire. No objection was made by defendant at the time the state exercised the peremptory challenge to her inclusion on the jury. Despite no objection being made, the state indicated the challenge was being made because Ms. Boudreaux was employed at the Terrebonne Addictive Disorders Clinic (TADAC).

[1] <u>See</u> <u>State v. Duncan</u>, 802 So.2d at 545–46.

We note from the record the trial court conducted an introductory colloquy with Ms. Boudreaux when her panel was first questioned on voir dire. At that time, Ms. Boudreaux related her employment status and indicated that she possibly knew some of the people in the courtroom through her work. The state then carried out a lengthy voir dire with Ms. Boudreaux. We note with particularity Ms. Boudreaux's testimony that she would like to serve and be unbiased but was not sure she could. She related she wanted to be honest and stated, "I do this every day and we hear all, everything." The trial court also did not abuse its discretion in denying the objection to the peremptory challenge against Ms. Boudreaux. The defendant failed to prove purposeful discrimination, and the state articulated a verifiable and legitimate explanation for striking this minority prospective juror.

This assignment of error is without merit.[155]

---

[155] <u>Smith</u>, 2014 WL 3510697, at *3-6; State Rec. Vol. 3 of 4.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[156]

In the instant case, the defense specifically raised a <u>Batson</u> objection to the state's peremptory challenges to three black prospective jurors – Nakita Williams, Geraldine Boudreaux, and Lonigan Valentine. The defense raised its first <u>Batson</u> objection, on the second day of jury selection, to the state's peremptory challenge of Nakita Williams, noting she was the fourth African American challenged by the State.[157] The trial court assumed for purposes of the challenge against Williams that there was a pattern of striking black potential jurors and asked the prosecution for a race neutral reason for challenging Williams and the prosecutor explained:

> Sure. I would have challenged her for cause but the Court rehabilitated her at the last, the last question it asked. Initially she had made the same allegations and gave the same opinion as Ms. Daigs in that she could not, that she would enter a verdict of not guilty even if the Court instructed her not to. And then she ultimately changed her mind after the Court questioned her. And when I questioned her she she said he [sic] would have trouble judging people in this case.[158]

During voir dire, Williams stated that "it's not up to me to judge if he's guilty of not guilty of whatever they say he did."[159] She answered in the affirmative when the prosecution asked if, because of her personal beliefs, issuing a guilty verdict would be a heavy burden for her to carry, and, when initially questioned by the trial court, Williams admitted she might vote not guilty even though the state proved its case.[160] The trial court then asked her a series of questions regarding

---

[156] <u>Smith</u>, 157 So.3d at 1127; State Rec. Vol. 2 of 4.
[157] State Rec., Vol. 2 of 4, trial transcript of May 24, 2011, p. 111-112. The record reflects that the previous day, the prosecution exercised peremptory challenges against James Celestine and Clarence Ray, however, the defense did not object at that time. State Rec., Vol. 1 of 4, trial transcript of May 23, 2011, pp. 188 and 191. Celestine claimed to know petitioner and his family. <u>Id.</u>, at pp. 127-128, 144-154. In questioning Ray, the prosecutor stated, "Mr. Ray, only because you are slouched down and when I said some of you don't want to be here you kind of shook your head earlier." <u>Id.</u>, at p. 174. Delores Burns, who also appears from the record to be black, was accepted as a juror. <u>Id.</u>, at p. 191.
[158] State Rec., Vol. 2 of 4, trial transcript of May 24, 2011, p. 112-113.
[159] <u>Id.</u>, at p. 73.
[160] <u>Id.</u>, at pp. 73, 102-103.

her ability to deliberate and follow the law and find Smith guilty if the state proved its case beyond a reasonable doubt, and Williams finally answered that she could do so.[161]

After the prosecution exercised a peremptory challenge and explained his reasoning was his belief that Williams could not be a fair juror based on her hesitancy to judge others, the trial court said it "would have been shocked" had the state not exercised a challenge and was "not surprised at all that he exercised a challenge" based on her responses.[162]  The trial court found it was satisfied that the state gave a valid race neutral reason for striking her.[163]

The state exercised its seventh peremptory challenge against Lonigan Valentine.[164]  The defense re-urged its Batson challenge.[165]  In response to the trial court's request for a race-neutral reason, the prosecution explained it believed Valentine was not forthcoming when the prospective jurors were asked whether any of them had been arrested for a crime or issued a misdemeanor summons.[166]  The prosecution argued that Valentine was charged with simple battery in 2010, but he failed to admit it during questioning.[167]  The prosecution further argued that Lonigan was a truck driver and that pills are often transported into the parish by trucks.[168]  The trial court found that it was reasonable to believe that Lonigan had lied and that it was a reasonable basis to exercise a peremptory challenge and denied the defense's objection.[169]

While the defense did not specifically raise Batson as to the prosecution's use of a challenge to strike Geraldine Boudreaux, the state explained that it struck her because she was

---

[161] Id., at p. 103.
[162] Id., at pp. 112-118.
[163] Id., at p. 118.
[164] Id., at p. 119.
[165] Id., at pp. 119-120.
[166] Id., at pp. 74, 77,
[167] Id., at pp. 120-128
[168] Id., at p. 121.
[169] Id., at pp. 127-128.

employed by Terrebonne Addictive Disorders.[170]  Boudreaux explained during voir dire that she

was a licensed professional counselor for substance abusers for nearly fifteen years and had seen

thousands of clients.[171]  Boudreaux explained that due to her job, she dealt with people with

substance abuse problems every day and expressed "mixed emotions about all of it."[172]  When

asked if she could set her experience aside and decide the case solely on the evidence, she said, "I

guess my thing is I really don't want to be put in the position to do it.  Okay?  Because that's not

what I am used to doing.  And I would like to serve legally and do my job and be bias [sic] with

it."[173]  She corrected herself and explained she was not sure she could be <u>unbiased</u>.[174]  She

ultimately said she could put everything aside and judge the case on the facts and law presented.[175]

The defense also did not specifically object to the state's peremptory challenge to Phyllis

Streeter, nor does petitioner even now mention her by name.[176]  Nonetheless, when discussing his

reasons for striking Williams, the prosecutor said:

> In addition, I'll go back and I'll let the Court know why I struck Ms. Streeter, since
> I'm being accused of being a racist here.  She indicated she has a chronic pain
> condition and she takes a bunch of pain medicine.  She was one of the ones shaking
> their head.  Before Ms. McNabb asked that question I wasn't going to strike her.[177]

McNabb had in fact questioned the venire if anyone had a chronic pain condition, whether

they had been prescribed medication for the condition, whether they found it to be expensive, and

whether it helped alleviate the pain, to which Streeter apparently raised her hand and nodded her

---

[170] <u>Id.</u>, at p. 119.
[171] <u>Id.</u>, at pp. 44-46.
[172] <u>Id.</u>, at pp. 80-81.
[173] <u>Id.</u>, at pp. 82-83.
[174] <u>Id.</u>, at p. 83.
[175] <u>Id.</u>, at pp. 83-84.
[176] <u>Id.</u>, at p. 109.
[177] <u>Id.</u>, at p. 115.

head.[178]  Neither the defense nor the trial court ever addressed the state's race-neutral reason for

challenging her.

As the state court correctly noted, petitioner's claim must be analyzed under the three-step

process established in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Specifically:

> First, a defendant must make a prima facie showing that a peremptory challenge
> has been exercised on the basis of race; second, if that showing has been made, the
> prosecution must offer a race-neutral basis for striking the juror in question; and
> third, in light of the parties' submissions, the trial court must determine whether the
> defendant has shown purposeful discrimination.

Snyder v. Louisiana, 552 U.S. 472, 476-77, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (quotation

marks and brackets omitted).

In the instant case, the trial judge assumed that a prima facie case had been established for

the purposes of striking Williams.[179]  The trial judge did not expressly find that a prima facie case

had been established for purposes of striking Valentine or Boudreaux and did not address Streeter.

In any event, the prosecutor in fact gave his reasons for his challenges.  Accordingly, the issue of

whether the defense established a prima facie case at the first step of Batson is therefore moot:

> Where ... the prosecutor tenders a race-neutral explanation for his peremptory
> strikes, the question of Defendant's prima facie case is rendered moot and our
> review is limited to the second and third steps of the Batson analysis.  See United
> States v. Broussard, 987 F.2d 215, 220 n. 4 (5th Cir. 1993) (declining to decide
> whether defendant had established prima facie case of racial discrimination, where
> district court required explanation for peremptory strikes).

United States v. Williams, 264 F.3d 561, 571 (5th Cir. 2001); see also Hernandez v. New York,

500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion) ("Once a prosecutor

has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled

---

[178] Id., at p. 95.
[179] State Rec., Vol. 2 of 4, trial transcript of May 24, 2011, at pp. 113-114.

on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

At the second step, the burden shifts to the striking party to articulate a race-neutral explanation for striking the jurors in question. Snyder, 552 U.S. at 476, 128 S.Ct. 1203. However, "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." Batson, 476 U.S. at 97, 106 S.Ct. 1712. On the contrary, "[a] neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the *facial validity* of the prosecutor's explanation. Unless a discriminatory intent is *inherent* in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez, 500 U.S. at 360, 111 S.Ct. 1859 (emphasis added). Here, the prosecutor's stated reasons for removing the jurors were not inherently indicative of discriminatory intent: the prosecutor stated that he struck Williams based on her response about her possible difficulty in coming to a guilty verdict based on her personal beliefs, Boudreaux based on her employment with TADAC, Valentine based on his failure to admit to a simple battery charge and his employment as a truck driver, and Streeter because she had a chronic pain condition for which she took pain medication. Obviously, those reasons are *facially* valid and nondiscriminatory.

Thus, the Court's inquiry proceeds to the third step and the ultimate question of whether intentional discrimination in fact motivated the state's peremptory strikes. "This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Rice v. Collins, 546 U.S. 333, 338 (2006). As noted, the trial judge in the instant case found that the prosecutor did not exercise his peremptory challenges against Valentine or Williams in a discriminatory manner. The trial judge did not make any explicit finding

36

regarding the challenges to Streeter or Boudreaux, but given that the challenges were upheld, it presumably found the challenges were not exercised in a discriminatory manner.

The United States Supreme Court has held that the state court's finding on Batson's third step is a finding of fact and, as such, must be reviewed under the AEDPA's specific and highly deferential standard of review applicable to factual determinations.  Therefore:

> Under AEDPA, ... a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Thus, a federal habeas court can only grant [the petitioner's] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge.  *State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence."* § 2254(e)(1).

Rice, 546 U.S. at 338-39 (2006); accord Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016) (Batson's third step "turns on factual determinations, and, in the absence of exceptional circumstances, we defer to state court factual findings unless we conclude that they are clearly erroneous." (quotation marks omitted)); Murphy v. Dretke, 416 F.3d 427, 432 (5th Cir. 2005) ("A state trial court's finding of the absence of discriminatory intent is a pure issue of fact that is accorded great deference and will not be overturned unless clearly erroneous." (quotation marks omitted)).  Therefore, even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, ... on habeas review that does not suffice to supersede the trial court's credibility determination."  Rice, 546 U.S. at 341-42; accord Wood v. Allen, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

When evaluating the persuasiveness of a prosecutor's proffered justification, the trial court must be mindful that "[a] prosecutor's intuitive assumptions, inarticulable factors, or even hunches

can ... be proper bases for rejecting a potential juror." United States v. Thompson, 735 F.3d 291, 297 (5th Cir. 2013).

Also:

> [C]ourts do not assess whether counsel's reason is suspect, or weak, or irrational. Instead, courts address whether counsel is telling the truth in his or her assertion that the challenge is not race-based. In determining whether a prosecutor discriminated on the basis of race, a court should consider the totality of the relevant facts.

Id. (citations and quotation marks omitted).

The state posed logical reasons for excluding the prospective jurors and each of those reasons was found to be race-neutral. Smith has offered no persuasive rebuttal to the state courts' finding of neutrality. The law requires that Smith ultimately do more than just object to the reason offered or to the trial court's finding of neutrality. Instead, as previously explained, Smith must rebut the presumption of correctness by clear and convincing evidence in order to show purposeful discrimination. Miller-El v. Cockrell, 537 U.S. 322, 341 (2003). Smith has not offered to this Court any evidence, much less clear and convincing evidence, to establish that the findings by the trial court were unreasonable, or not supported by the record, in such a manner as to overcome the presumption of correctness under the AEDPA. Accordingly, applying the deferential standard of review mandated by the AEDPA, this Court should deny his Batson claim.

## C.  Motion In Limine Rap Video

In his next assignment of error, petitioner claims that the trial court erred in denying the defense's motion in limine to exclude the state's introduction of "gangster rap" videos. In one video Smith is heard rapping about traveling to Texas to purchase prescription drugs to re-sell. In a second video, he says they actually do the things they rap about.

On May 9, 2011, the state filed a notice of its intent to use an inculpatory statement in accordance with La. Code Crim. P. art. 768.2.[180]  The notice showed the state intended to offer statements contained in the state's file including statements made on recordings that were provided to the defense on a compact disc.[181]  Smith filed a motion in limine seeking to exclude videotape material involving "The RICO Gang" pursuant to La. Code Evid. art. 403.[182]

Prior to jury selection, the trial court heard argument from the parties.[183]  During a recess, the trial court watched four RICO Gang video recordings with audio downloaded from YouTube.[184]  The trial court found that, assuming the state could lay the proper foundation, two videos would be admissible, but two videos were not admissible because the prejudice to Smith outweighed the probative value.[185]  It specifically ruled that the "Behind the Scenes" video and the "BMF Freestyle" video were admissible.[186]

The videos were admitted at trial during the testimony of Jermaine White and played for the jury.[187]  The Louisiana First Circuit denied the issue on appeal as follows:

> In assignment of error number 3, the defendant claims that the trial court erred in denying the defendant's motion in limine to exclude the state's introduction of "gangster rap" videos in which the defendant is heard rapping about traveling to Texas to purchase prescription drugs to re-sell.  On May 9, 2011, the state filed a notice of its intent to use an inculpatory statement in accordance with La. Code Crim. P. art. 768.2.  The notice showed the state intended to offer statements contained in the state's file.  A copy of the file had been made available to the defendant through open-file discovery.  The notice also stated "Additionally, the [s]tate intends to introduce into evidence all statements in the recordings set forth on or in the enclosed compact disc or DVD."  The defendant filed a motion in limine seeking to exclude the material from being introduced into evidence, citing La. Code Evid. art. 403, which states, "Although relevant, evidence may be excluded

---

[180] State Rec., Vol. 1 of 4, Notice of Intent to Use Inculpatory Statement and/or Confession filed May 9, 2010.
[181] Id.
[182] State Rec., Vol. 1 of 4, Defendant's Motion in Limine filed May 18, 2011; Defendant Clyde Smith's Memorandum in Support of His Motion in Limine filed May 18, 2011.
[183] State Rec., Vol. 1 of 4, trial transcript of May 23, 2011, pp. 18-33.
[184] Id., at pp. 43-44.
[185] Id., at pp. 44-45.
[186] Id., at pp. 45-48.
[187] State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, pp. 81-93, 96-97.

if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

Generally, evidence of criminal offenses other than the offense being tried is inadmissible as substantive evidence because of the substantial risk of grave prejudice to the defendant. State v. Hills, 99–1750 (La. 5/16/00), 761 So.2d 516, 520. Under La. Code Evid. art. 404(B),[3] evidence of other crimes, wrongs, or acts is not admissible to show a person acted in conformity therewith. The article does contain certain exceptions to the general rule allowing admission for other purposes. Among these other purposes are proof of motive, opportunity, intent, preparation, plan, or knowledge. Any inculpatory evidence is "prejudicial" to the defendant, especially when it is "probative" to a high degree. As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. State v. Germain, 433 So.2d 110, 118 (La.1983); see also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder in declaring guilt on a ground different from proof specific to the offense charged"); State v. Rose, 2006–0402 (La.2/22/07), 949 So.2d 1236, 1244.

[3]"La.Code Evid. art. 404(B) provides:
Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Logically, it falls to the trial court in its gatekeeping function to determine the independent relevancy of such evidence and balance its probative value against its prejudicial effect. See La. Code Evid. art. 403; Huddleston v. United States, 485 U.S. 681, 690–91, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). Upon finding such relevance, the court must then balance all the pertinent factors weighing in favor of and against its admissibility. See C. McCormick, Evidence § 190, 768 (6th ed.2006). In this analysis, the court seeks to answer the question: Is this evidence so related to the crime on trial or a material issue or defense therein that, if admitted, its relevancy will outweigh the prejudicial effect, which the defendant will necessarily be burdened with?

The trial court's answer to this question and its corresponding ruling on the admissibility of the additional other crimes evidence will not be disturbed absent an abuse of discretion. State v. Garcia, 2009–1578 (La.11/16/12), 108 So.3d 1, 39, cert. denied, Garcia v. Louisiana, ––– U.S. ––––, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013).

At the hearing on the motion in limine, the state provided the court with a compact disc containing three rap videos and a "behind the scenes" video made by the defendant and other individuals. The state had taken the videos from the

internet website YouTube. The videos were performances made by a group which identified itself as the "Rico Gang." The defendant was the lead performer in one of the videos and one of the main "hosts" of the behind the scenes video. On the disc, the videos are named "Rico—We Go Hard;" "Rico—I'm Ill;" "Rico—BMF Freestyle;" and "Rico—Behind Scenes." After the hearing on the motion in limine, the trial court ruled the state would only be allowed to introduce the last two videos, "BMF Freestyle" and "Behind Scenes." In allowing the evidence to be admitted, the trial court noted "the probative value of what is reflected by those two tapes, I think does outweigh any prejudice that might otherwise be present."

Among the inculpatory statements made in the "BMF Freestyle" video are the defendant saying in conjunction with another performer "We both go to Texas get it from the same people, The Rico gang selling coke and pills like its legal." The defendant later says "I think I'm Domino's, yeah, Pizza Hut, yeah, cause I deliver." Also included is the statement "another trip to Texas, b—— I'm going doctor shopping." In the "Behind the Scenes" video, the defendant states to the camera "And we really do that s—— we talk about. Like we really take those trips...." The probative value of the statements is clear.

It is self-evident that a party seeking to introduce evidence over an objection bears the burden of showing that it is relevant. However, it is equally self-evident that once that burden is met, the burden shifts to the party opposing the introduction of the evidence to show that the evidence is inadmissible under La. C.E. art. 403 because its probative value is substantially outweighed by its prejudicial effect. State v. Jones, 2003–0829 (La. App. 4th Cir.12/15/04), 891 So.2d 760, 767, writ denied, 2005–0124 (La.11/28/05), 916 So.2d 140.

In the instant case, state witness Jason Pierce testified he and the defendant had gone to Texas on December 23, 2010 to obtain prescription medication for the purpose of distribution. He and the defendant saw different doctors and purchased medication at multiple pharmacies. Pierce testified he and the defendant had been to Texas on prior occasions to buy pills. The defendant testified that the video statements were only meant as entertainment and touched "on those topics that I see that happen around me." The statements show proof of motive, intent, preparation, plan, and knowledge. As such, the statements are admissible under La.Code Evid. art. 404(B).

We note the trial court instructed the jury as follows:

If you find that a defendant made a statement, you must also determine the weight or value that the statement should be accorded, if any. In determining the weight or value to be accorded a statement made by a defendant, you should consider all the circumstances under which the statement was made. In making that determination, you should consider whether the statement was made freely and voluntarily, without the influence fear, duress, threats, intimidation, inducement, or promises.

In the weighing of the conflicting testimony, the statements in the videos corroborate the testimony of the state's witness. There is ample evidence to show

the jury did not base its decision only on the statements made by the defendant. The defendant has not shown an abuse of discretion by the trial court.

This assignment of error is without merit.[188]

The Louisiana Supreme Court denied writs without stated reasons on January 16, 2015.[189]

The United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998). Therefore, to the extent that petitioner is arguing that the state courts misapplied state evidence law, his claim simply is not reviewable in this federal proceeding. See, e.g., Pettus v. Cain, Civ. Action No. 14-1685, 2015 WL 1897711, at *7 (E.D. La. Apr. 27, 2015).

To the extent that petitioner is asserting a federal claim, he fares no better for the following reasons.

First, the state notes in its response that a state court decision denying such a claim could be the basis for federal habeas corpus relief only if the decision were "contrary to" or an "unreasonable application of" clearly established federal law. See 28 U.S.C. § 2254(d)(1). The state opines that the United States Supreme Court has never held that the admission of other "other crimes" evidence can serve as the basis for a due process violation. See Wright v. Van Patten, 552 U.S. 120, 126 (2008) (holding that when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law" (quotation marks and brackets omitted) ). That point is well taken. See, e.g., Wallace v. Deville, No. 17-407, 2017 WL 2199024, at *16 (E.D. La. Apr. 26, 2017) ("Absent controlling Supreme Court precedent on the issue [of whether the admission of prior crimes evidence violates due process], the state courts' determination cannot

---

[188] Smith, 2014 WL 3510697, at *6-8; State Rec., Vol. 3 of 4.
[189] State v. Smith, 157 So. 3d 1127 (La. 2015); State Rec., Vol. 2 of 4.

be said to be contrary to, or an unreasonable application of, clearly established federal law."),
adopted, 2017 WL 2198957 (E.D. La. May 18, 2017).

Second, petitioner's claim also fails under the normal due process analysis applied to evidentiary claims. The United States Fifth Circuit Court of Appeals has explained:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); accord Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted."). Under these standards, to establish a fundamentally unfair trial, a petitioner must show a reasonable probability that the verdict would have been different had the trial been properly conducted. Kirkpatrick v. Blackburn, 777 F.2d 272, 279 (5th Cir. 1985).

Here, even if the rap video evidence was erroneously admitted, which is doubtful for the reasons noted by the Louisiana First Circuit Court of Appeal, petitioner's right to due process was not violated because the videos, while undoubtedly playing a role, cannot be said to have played a crucial, highly significant factor in the jury's guilty verdict. See Gonzales v. Thaler, 643 F.3d 425, 430 (5th Cir. 2011) ("The due process inquiry must consider the significance of the challenged evidence in the context of the entire trial. We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not so pronounced and persistent that it permeates the entire atmosphere of the trial." (quotation marks and footnotes omitted)). As an initial matter, it must be noted that the jurors were carefully instructed by the court regarding the limited purposes for which the "other crimes" evidence could

be considered,[190] and courts have repeatedly noted that jurors are presumed to follow their instructions.  See, e.g., Jones v. United States, 527 U.S. 373, 394 (1999); United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1349 (5th Cir. 1994).

Second, the prosecution introduced substantial evidence, apart from the videos, that Smith was in possession of Hydrocodone (Lortab) and Alprazolam (Xanax) and attempted possession of Carisprodol (Soma) and had the intent to distribute them.  Smith admitted that the backpack, which had the controlled substances and all the coupons, lists of pharmacies, and other damaging evidence, belonged to him.  The evidence and Smith's own testimony demonstrated that Smith had been to multiple doctors in Houston in a matter of one week.  Further, Pierce testified that the intent of the trip to Houston was to get prescription drugs and return to Louisiana to sell them and that he and Smith had made several trips previously.  Obviously, that compelling evidence was alone sufficient to prove his guilt even without the video evidence.

For all of these reasons, this claim should be denied.

### D.  Excessive Sentence

Smith next contends that his thirty-year habitual offender sentence is constitutionally excessive.

Smith raised this claim on direct appeal.  The Louisiana First Circuit rejected the claim, holding:

---

[190] State Rec., Vol. 1 of 4, Instructions to the Jury filed May 26, 2011; State Rec., Vol. 2 of 4, trial transcript of May 26, 2011, pp. 118-119.  The trial court instructed that "Smith, is on trial today only for the offenses charged, that is, Possession with Intent to Distribute Hydrocodone, Possession with Intent to Distribute Alprazolam and Possession with the Intent to Distribute Carisprodal.  You may not find him guilty of one or more of these offenses just because you believe he may have committed some other criminal offense or some other bad act at another place or time."  It further instructed: "If you find that a defendant made a statement, you must also determine the weight or value that the statement should be accorded, if any.  In determining the weight or value to be accorded a statement made by a defendant, you should consider all the circumstances under which the statement was made.  In making that determination, you should consider whether the statement was made freely and voluntarily, without the influence fear, duress, threats, intimidation, inducement, or promises."  Id.

In assignment of error number 4, defendant argues the sentence of thirty years at hard labor without benefit of probation or suspension of sentence imposed for his conviction on count I was constitutionally excessive. He does not challenge the sentences imposed on counts II and III.

Subsequent to the convictions in the instant case, but prior to sentencing, the state filed a bill of information to have the defendant declared a habitual offender on all counts. At the habitual offender hearing, the defendant agreed that he was the person involved in the previous offenses. Thereafter, the defendant was adjudicated a third-felony habitual offender. The trial court then imposed sentence under the provisions of La. R.S. 15:529.1(A)(3)(a), which, in pertinent part, provides:

> (3) If the third felony is such that upon a first conviction, the offender would be punishable by imprisonment for any term less than his natural life then:
>
> (a) The person shall be sentenced to imprisonment for a determinate term not less than two-thirds of the longest possible sentence for the conviction and not more than twice the longest possible sentence prescribed for a first conviction;

On count I, the defendant was convicted of possession with intent to distribute a Schedule II controlled dangerous substance (Hydrocodone). The applicable penalty provision for a first conviction is contained in , which, in pertinent part, states:

> (1) A substance classified in Schedule II ... which is a narcotic drug,[4] ... shall be sentenced to a term of imprisonment at hard labor for not less than two years nor more than thirty years; and may, in addition, be sentenced to pay a fine of not more than fifty thousand dollars.

[4]La. R.S. 40:961 Definitions:
(26) "Narcotic drug" means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:
(a) Opium, coca leaves, and opiates.
Hydrocodone is an opiate. See La. R.S. 40:964, Schedule II(A)(1)(1).

The maximum sentence for a third-felony habitual offender under the pertinent statutes was sixty years at hard labor without benefit of probation or suspension of sentence.[5] The minimum sentence was twenty years hard labor without benefit of probation or suspension of sentence. The trial court imposed a sentence of thirty years at hard labor without benefit of probation or suspension of sentence.

[5]See La. R.S. 15:529.1(G).

Prior to imposing the sentence, the trial court considered the defendant's age, which was thirty-one years at the time. The trial court noted that although the defendant was adjudicated a third-felony offender for purposes of the habitual offender statute, he actually had four felony convictions since 1996. Of these, two involved violations of the controlled dangerous substance law, and two involved the attempted possession of a weapon. The trial court stated the defendant's behavior and convictions "indicate to the Court a conscious decision by [the

defendant] to disregard the criminal laws of the State of Louisiana and engage in a consistent and deliberate pattern of criminal activity." We note that the defendant was convicted in this case as a distributor, not a user. We further note that drug offenses are not victimless crimes. Indeed, as noted by the Louisiana Supreme Court, drug offenses affect not only the user, but society in general through higher medical costs, higher unemployment rates, loss of tax revenue from those unemployed, and associated crimes. Moreover, this Court will not set aside a sentence on the ground of excessiveness if the record supports the sentence imposed. La. Code Crim. P. art. 881.4(D). Considering the great discretion afforded to the trial court in fashioning the defendant's punishment and bearing in mind the nature of the crime, we find that the record provides ample justification for the sentence imposed on count I. The sentence is not grossly disproportionate to the severity of the offenses or shocking to the sense of justice and, therefore, is not unconstitutionally excessive.

The defendant argues in his brief that the trial court erred when it did not order a presentence investigation report ("PSI"). Ordering a presentence investigation report is discretionary with the trial court; there is no mandate that a PSI be ordered. See La. Code Crim. P. art. 875(A)(1) ("the court may order ..."). Such an investigation is an aid to the court and not a right of the accused. The trial court's failure to order a PSI will not be reversed absent an abuse of discretion. State v. Wimberly, 618 So.2d 908, 914 (La. App. 1st Cir.), writ denied, 624 So.2d 1229 (La.1993). In the present case, the trial court allowed the defendant to make a prolonged statement at his hearing on the motion for new trial and allowed defense counsel to argue and the opportunity to present a sentencing memorandum prior to imposing sentence. We find no abuse of discretion by the trial court.

This assignment of error is without merit.[191]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[192]

To the extent that petitioner is claiming that his sentence is excessive or otherwise inappropriate under Louisiana law, that claim is not cognizable in this federal proceeding. Federal habeas corpus relief is available only to correct violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law. Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, a federal habeas court will not review the legality of a petitioner's sentence under state law. See, e.g., Nyberg v. Cain, Civ. Action No. 15-98, 2015

---

[191] Smith, 2014 WL 3510697, at *8-10; State Rec., Vol. 3 of 4.
[192] Smith, 157 So. 3d at 1127; State Rec., Vol. 2 of 4.

WL 1540423, at *12 (E.D. La. Apr. 7, 2015); Phillips v. Cain, Civ. Action No. 13-5868, 2014 WL 4425751, at *10 (E.D. La. Sept. 8, 2014), adopted, 2014 WL 5080246 (E.D. La. Sept. 26, 2014); Brunet v. Goodwin, Civ. Action No. 12-1974, 2013 WL 623505, at *12 (E.D. La. Jan. 22, 2013), adopted, 2013 WL 619278 (E.D. La. Feb. 19, 2013).

On the other hand, to the extent that petitioner is claiming that his sentence is excessive under *federal* law, that claim obviously is cognizable; however, for the following reasons, it is also meritless.

The United States Supreme Court has held that "the Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime." Rummel v. Estelle, 445 U.S. 263, 271, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). However, over the last few decades, the Supreme Court's jurisprudence concerning excessive sentence claims has been in flux, with the various justices unable to speak with one voice on the law. In fact, in 2003, the Supreme Court noted that a federal habeas court's charge to determine what constitutes clearly established federal law for the purposes of analyzing an excessive sentence claim was no easy task, given that the Supreme Court's jurisprudence concerning such claims had "not been a model of clarity." Lockyer v. Andrade, 538 U.S. 63, 72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). In Lockyer, the Supreme Court ultimately concluded that the "only relevant clearly established law" with respect to an excessive sentence claim was "the gross disproportionality principle, the precise contours of which are unclear, applicable only in the exceedingly rare and extreme case." Id. at 73, 123 S.Ct. 1166 (quotation marks omitted); see also id. at 72, 123 S.Ct. 1166 ("Our cases exhibit a lack of clarity regarding what factors may indicate gross disproportionality.").

Federal courts accord broad discretion to a state trial court's sentencing decision that falls within statutory limits. Haynes v. Butler, 825 F.2d 921, 923–24 (5th Cir.1987), cert. denied, 484

U.S. 1014, 108 S.Ct. 717, 98 L.Ed.2d 667 (1988); see Turner v. Cain, 199 F.3d 437, 1999 WL 1067559, at *3 (5th Cir. 1999) (Table, Text in Westlaw) (because sentence was within Louisiana statutory limits and within trial court's discretion, petitioner failed to state cognizable habeas claim for excessive sentence); Dennis v. Poppel, 222 F.3d 1245, 1258 (10th Cir. 2000) (citing Haynes, 825 F.2d at 923-24). If a sentence is within the statutory limits, a federal habeas court will not upset the terms of the sentence unless it is grossly disproportionate to the gravity of the offense. Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). "[W]hen a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality,' " a court will consider (a) the sentences imposed on other criminals in the same jurisdiction and (b) the sentences imposed for commission of the same offense in other jurisdictions. Smallwood v. Johnson, 73 F.3d 1343, 1347 (5th Cir. 1996) (quoting Harmelin, 501 U.S. at 1005, 111 S.Ct. 2680) (citing McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992)); United States v. Gray, 455 F. App'x 448, 449 (5th Cir. 2011); United States v. Thomas, 627 F.3d 146, 160 (5th Cir. 2010), cert. denied, 131 S.Ct. 2470, 179 L.Ed.2d 1230 (2011).

If the sentence is not "grossly disproportionate" in the first instance, however, the inquiry is finished. United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997), overruled in part on other grounds, United States v. O'Brien, 560 U.S. 218, 234-35, 130 S.Ct. 2169, 176 L.Ed.2d 979 (2010) (as recognized in United States v. Johnson, 398 F. App'x 964, 968 (5th Cir. 2010)). As the Supreme Court has noted, successful proportionality challenges outside the context of capital punishment are "exceedingly rare" and constitutional violations are sustained only in "extreme" or "extraordinary" cases. Ewing v. California, 538 U.S. 11, 22, 123 S.Ct. 1179, 155 L.Ed.2d 108

(2003) (quotation and citations omitted); <u>Lockyer</u>, 538 U.S. at 73, 77 (quotation and citations omitted).

Louisiana law provides that a person convicted of possession with the intent to distribute Hydrocodone faces a maximum sentence of thirty years.  La. Rev. Stat. § 40:967(B)(1).  However, petitioner was sentenced as a <u>third</u> felony offender.  At the time of his crime, La. Rev. Stat. § 15:529.1(G) provided for a third felony offender to receive a sentence of not less than twenty years and a maximum sentence of sixty years.  Accordingly, this Court considers only proportionality compared with sentences imposed in similar cases.

The United States Supreme Court has stated that " '[t]he Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.' "  <u>Ewing</u>, 538 U.S. at 23, 123 S.Ct. 1179 (quoting <u>Harmelin</u>, 501 U.S. at 1001, 111 S.Ct. 2680 (Kennedy J., concurring in part and concurring in judgment)).  The Supreme Court has recognized that only the rare case will reach the level of gross disproportionality.  <u>Id.</u>, 538 U.S. at 30, 123 S.Ct. 1179 (quoting <u>Harmelin</u>, 501 U.S. at 1005, 111 S.Ct. 2680).

Before imposing the sentences, the state trial court addressed the facts and circumstances of the case at length and gave specific reasons to support the sentence imposed.  The court noted that it had considered the criteria of La Code Crim. P. art. 894.1.[193]  The trial court explained:

> Because Mr. Smith is a habitual offender, the sentencing possibilities are increased for each of the charges for which he was found guilty on May 26th, 2011.  And in reviewing the possible sentences for each charge, the Court notes that for count one, possession with intent to distribute Hydrocodone, the sentencing range established by law must be at least 20 years but not more than 60 years.
> For the second count, possession with intent to distribute Alprazolam, the sentence must be at least 80 months but not more than 20 years.

---

[193] State Rec., Vol. 1 of 4, sentencing transcript of November 18, 2011, p. 3.

And for the charge of attempted possession with intent to distribute Carisoprodal. for which the defendant was convicted, the sentence must be a minimum of 40 months but not more than 10 years.

The Court has also, at the defendant's request, reviewed the jurisprudence of Louisiana with regard to the sentences. The defendant alleges that the sentences provided by the Habitual Offender Law are constitutionally excessive under the circumstances of this case, and he relies particularly on the case of State versus Dorothy, a Louisiana Supreme Court case from 1993.

In this particular case, the Court again notes that the defendant was adjudicated a third offender on November 16th, and the prior convictions used to adjudicate him as such included a conviction for possession of cocaine in 1996, and two convictions for attempted possession of a firearm by a convicted felon. Both of those convictions having been obtained on March 14th, 2003. Although those two convictions for attempted possession of a firearm by a convicted felon were two separate convictions under Louisiana law that can only be counted as one conviction for purposes of the Habitual Offender Law adjudication and sentencing provisions because they were obtained on the same day.

It appears that Mr. Smith, who is 31 years of age, has now actually been convicted of four felony offenses since 1996, although he's been adjudicated only a third offender for purposes of the Habitual Offender Law. Those four felony convictions have occurred within a span of 14 years, and they indicate to the Court a conscious decision by Mr. Smith to disregard the criminal laws of the state of Louisiana and engage in a consistent and deliberate pattern of criminal activity.

The Habitual Offender Law was enacted by the legislature to address just, to address people in a position just like that of Mr. Smith; those who choose to deliberately disregard the criminal laws of the State.

In light of the prior convictions, the fact that two of them involve the attempted possession of a weapon, the fact that one of them was a previous violation of the Uniform Control Dangerous Substance Law and his most recent conviction involve three violations of the Louisiana Uniform Control Substances Law, the Court has confected sentences which will now be imposed in this case.[194]

The trial court then sentenced petitioner to thirty years as to count one, ten years as to count two, and five years as to count three, each sentence to run concurrently and to be served at hard labor without the benefit of probation or suspension of sentence.[195]

A survey of the limited number of Louisiana cases in the public domain establishes that Smith's sentence was not out of line with sentences imposed upon similarly situated defendants who were third offenders.  See, e.g., State v. Wade, --- So.3d ----, 2020 WL 215968, at *4-9 (La.

---

[194] Id., at pp. 3-5.
[195] Id., at pp. 5-6.

App. 2d Cir. Jan. 15, 2020) (fifty-year sentence for third felony offender charged with possession with the intent to distribute a Schedule II controlled dangerous substance was not excessive); State v. Wilson, 04-1156, 888 So.2d 1169 (La. App. 4th Cir. 2004) (unpublished) (affirming a forty-year sentence for defendant convicted of distribution of cocaine and adjudicated a third felony offender).

Smith has not shown that his sentence was grossly disproportionate or unconstitutionally excessive under the circumstances of his case or in comparison with other similar cases in Louisiana. The state courts' denial of relief on this issue was neither contrary to established Supreme Court case law nor an unreasonable application of Supreme Court precedent. Smith is not entitled to relief on this claim.

### E. and Q.  Right to Counsel of Choice

In two separate claims, Smith asserts he was denied the right to choice of counsel at the hearing on his post-trial motions. He claims he hired attorney John Thomas for investigative purposes and to file post-trial motions, yet his trial counsel represented him at the hearing on the motions. Petitioner claims he was not aware of any arrangement between the attorneys for McNabb to argue the motions and would not have consented to such an agreement.

On June 2, 2011, Smith's trial attorney, Assistant Public Defender Carolyn McNabb, filed post-trial motions.[196] Several weeks later, petitioner retained attorney John Thomas who sought and was granted permission to enroll as counsel for Smith.[197] On July 19, 2011, McNabb filed a motion to continue a hearing on the motions scheduled for July 25, 2011, as she had a scheduled vacation.[198] Thomas filed a supplemental memorandum in support of the post-trial motions on

---

[196] State Rec., Vol. 1 of 4, Defendant's Motion for Post-Verdict Judgment of Acquittal filed June 2, 2011; Defendant's Motion for New Trial filed June 2, 2011.
[197] State Rec., Vol. 1 of 4, Motion to Enroll as Counsel filed June 20, 2011; Order filed June 21, 2011.
[198] State Rec., Vol. 1 of 4, Defendant's Motion and Order to Continue Hearing filed July 19, 2011.

July 22, 2011.[199]  On July 25, 2011, the trial court held a hearing and relieved the Office of the District Public Defenders of its appointment in the case and continued the hearing on the post-trial motions at Thomas's request, yet also granted McNabb's motion to continue the hearing.[200]

At the hearing on September 14, 2011, McNabb appeared as counsel for petitioner.[201] McNabb explained that she and Thomas discussed the matter and he felt that, as she represented petitioner at the trial, she was more familiar with the matter and he preferred she argue the motions as he would have to order the trial transcript.[202]  When the trial court asked if McNabb was going to handle the arguments for Thomas, she answered in the affirmative.[203]  There is no indication in the transcript or the minutes that petitioner objected to McNabb arguing the motions.[204]  McNabb argued the motions and the trial court also gave petitioner several opportunities to present his own arguments, after which the trial court denied the motions.[205]

Petitioner raised these issues in his original and supplemental applications for post-conviction relief and claimed that he told the trial court at the hearing that he was represented by Thomas, although he claimed that his objection was not transcribed.  He claimed that the trial court erred in failing to ask Smith if he was agreeable to McNabb arguing the motions and that this resulted in a structural error.

The state district court twice rejected the claims, finding:

---

[199] State Rec., Vol. 1  of 4, Defendant's Supplemental Memorandum in Support of Motion for New Trial and for Judgment of Acquittal filed July 25, 2011.

[200] State Rec., Vol. 1 of 4, minute entry dated July 25, 2011; Order dated July 25, 2011.

[201] State Rec., Vol. 1 of 4, hearing transcript of September 14, 2011.

[202] Id., at p. 2.  In fact, the record reflects that Thomas later filed a motion seeking Louisiana Appellate Projects funds to pay for the transcript for appellate purposes because Pontiff, who had hired Thomas as counsel for petitioner, had been seriously injured and could not afford to pay for the transcript.  State Rec., Vol. 1 of 4, Ex-Parte Motion for Appellate Project Funds for Transcript filed September 14, 2012.  The trial court later denied petitioner's request to be declared indigent.  State Rec. Vol. 1 of 4, minute entry dated November 14, 2012.

[203] Id., at p. 3.

[204] Id.; State Rec., Vol. 1 of 4, minutes of September 14, 2011.

[205] State Rec., Vol. 1 of 4, hearing transcript of September 14, 2011.

In his first assignment of error, the defendant alleges that his constitutional rights were violated because he was denied "the right to counsel of choice." He explains that he was represented atrial by Carolyn McNabb with the Office of the District Public Defender. He and his family hired private counsel, John Hall, to handle the post-trial motions after the guilty verdicts were returned.

The record reveals that Ms. McNabb filed a Motion for a New Trial and Motion for Post-Verdict Judgment of Acquittal on the defendant's behalf on June 2, 2011, and the matters were set for hearing on July 25, 2011. Mr. Thomas enrolled as counsel of record for the defendant by written motion filed June 20, 2011. On July 19, 2011, Ms. McNabb requested that the hearing on the post trial motions be postponed. On July 22, 2011, Mr. Thomas filed a memorandum in support of the post trial motions, and he appeared in open court on July 25, 2011, for the scheduled hearing. On that day, Mr. Thomas moved for a continuance of the hearing, enrolled as counsel of record again, and requested that the Office of the District Public Defendant be relieved of its appointment as counsel for the defendant . The court granted the motions and reset the hearing on post trial motions for September 12, 2011. On September 12, 2001, the hearing was reset for September 14, 2011, at the request of the state.

The minutes of the court reflect that on September 14, 2011, Ms. McNabb appeared in court for the hearing "on behalf of Mr. John H. Thomas, attorney." After argument, the post trial motions of the defendant were denied.

Contrary to the defendant's assertion in the memorandum submitted with his post conviction relief application, it was Ms. McNabb who filed post trial motions on his behalf, not Mr. Thomas. In any event, he claims that he did not know beforehand that Mr. Thomas would not be in court on September 14, 2011, to argue on his behalf, and he was shocked and surprised when Ms. McNabb appeared. According to the transcript of the hearing, the court acknowledged that it was anticipating the appearance of Mr. Thomas instead of Ms. McNabb. Ms. McNabb explained:

"The Court: Okay, Mr. Smith, you're here. All right. This is Docket No. 600641, State versus Clyde Edward Smith. Now why are you here for that? Mr. Thomas filed motions.
MS. MCNABB: He did, Your Honor. Mr. Thomas and I spoke about it, because I attended the trial and I'm more conversed with what happened—
THE COURT: Okay.
MS. MCNABB: I think he preferred that I argue it.
THE COURT: Okay, fine.
Ms. MCNABB: Plus, he'd have to order the transcript.
THE COURT: Okay, so you're going to handle it for him?
MS. MCNABB: Yes.
THE COURT: Okay, fine."
(Transcript, September 14, 2011, p. 2, line 15, through p. 3, line 7.)

Throughout the exchange between the court and Mrs. McNabb, the defendant was present in court. At no time did he voice any objection to Ms. McNabb appearing on behalf of Mr. Thomas to argue the merits of the post trial

motions.  The defendant now claims, "The trial court's failure to address Mr. Smith about this alleged arrangement was error and it violated his right to counsel of his choice."

The court disagrees.  The court was not privy to any agreement or arrangements by and amount the defendant, Mr. Thomas, and Ms. McNabb.  The court had no way of knowing that Mr. Smith had an objection to the appearance by Ms. McNabb in Mr. Thomas' stead.  Had the defendant objected, of course, said something while this scenario unfolded in front of him, the court would have  had an opportunity and a reason to delve further into the matter.  A criminal defendant does not have a constitutional right which imposes upon a court an obligation to confer with the defendant to confirm that an attorney who appears with him in court, does, in fact, have the authority to represent him in connection with the proceeding, especially when that attorney has represented him in the past in the same proceeding, and especially when the defendant does not voice an objection to the appearance at the time it is made.[206]

***

The seventh supplemental claim by the defendant sets forth the defendant's allegation that he was deprived of his constitutional right to counsel of his choice.

According to defendant:

"In the instant case, defendant Smith hired counsel John Thomas for investigative purposes and to thereafter file appropriate motions seeking a New Trial and Post-Verdict Judgment of Acquittal.  I wasn't notified of any arrangement between former counsel McNabb and himself to argue these motions nor would I have consented, as evidence [evidenced] by my oral objections made on September 14, 2011."

The court has review the transcript of the hearing on post trial motions conducted on September 14, 2011, at which the defendant was present and at which the court allowed him more than once to address the court at his own request.  Never did he object to Ms. McNabb appearing on his behalf at the hearing or in any way suggest that he did not want her there.

The court will not grant the defendant any relief for this claim for the reasons detailed hereinabove in connection with his first original assignment of error.[207]

---

[206] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 5-7.
[207] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, p. 26.

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[208]  The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[209]

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."  Wrongful deprivation of choice of counsel is a "structural error" that "pervades the entire trial."  <u>United States v. Gonzalez–Lopez</u>, 548 U.S. 140, 150 (2006).  As the Supreme Court has recently recognized, "[d]ifferent lawyers do all kinds of things differently, sometimes 'affect[ing] whether and on what terms the defendant ... plea bargains, or decides instead to go to trial'—and if the latter, possibly affecting whether she gets convicted or what sentence she receives.  So for defendants ... having the ability to retain the 'counsel [they] believe[ ] to be best'—and who might in fact be superior to any existing alternatives—matters profoundly."  <u>Kaley v. United States</u>, 571 U.S. 320, 337, 134 S.Ct. 1090, 1102–03 (2014) (footnote and citations omitted).

[The United States Supreme Court has] previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." <u>United States v. Gonzalez–Lopez</u>, 548 U.S. 140, 144, 126 S. Ct. 2557, 165 L.Ed.2d 409 (2006).  That said, the Supreme Court has further acknowledged that "the right to counsel of choice is circumscribed in several important respects."  <u>Id.</u> (quotation marks omitted).  Of importance in the instant case, the Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice ... against the demands of its calendar."  <u>Id.</u> at 152 (citing <u>Wheat v. United States</u>, 486 U.S. 153, 163–164 (1988) and <u>Morris v. Slappy</u>, 461 U.S. 1, 11–12 (1983)).  Thus, a trial court has broad discretion and "power to enforce rules or adhere to practices that determine

---

[208] <u>State v. Smith</u>, No. 2016 KW 1486, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[209] <u>State ex rel. Smith</u>, 249 So. 3d at 824, State Rec., Vol. 4 of 4.

which attorneys may appear before it, or to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." Gonzalez–Lopez, 548 U.S. at 151–52. "[T]rial courts must necessarily be wary of last minute requests to change counsel lest they impede the prompt and efficient administration of justice." United States v. Pineda Pineda, 481 F. App'x 211, 212 (5th Cir. 2012) (quoting McQueen v. Blackburn, 755 F.2d 1174, 1178 (5th Cir. 1985) ); United States v. Magee, 741 F.2d 93, 95 (5th Cir. 1984) (holding that "it is within the judge's discretion to deny a change of counsel on the morning of trial if the change would require a continuance.").

Accordingly, the Supreme Court has expressly held:

> Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.

Morris, 461 U.S. at 11–12 (quotation marks omitted).

Here, absolutely no evidence of record supports petitioner's claim that he objected to either Thomas's failure to appear at the hearing or McNabb's representation of him at the hearing on the post-trial motions. As noted, McNabb, in fact, filed the post-trial motions, although Thomas filed a supplemental memorandum. When questioned by the trial court as to her appearance at the hearing, McNabb explained Thomas felt that as she was more familiar with the trial, and, as Thomas did not have the trial transcript, she should argue the motions. At no time was Thomas prevented from arguing the motions, it appears that he simply elected not to appear at the hearing or argue the motions himself. Again, nothing in the record shows that petitioner objected to the hearing going forward or that he requested a continuance of the hearing. Rather, petitioner actively participated in the hearing, adding his own comments to the arguments made by McNabb and the

prosecution.[210]  At no time during his comments, did he express any concern about Thomas's failure to appear at the hearing or McNabb's representation of him at the hearing.

For all of the foregoing reasons, Smith has not established a constitutional error in the state court's going forward with the hearing on the motions.  He has not shown that allowing trial counsel to argue the motions harmed the defense, amounted to constructive denial of counsel or the denial of the right to choice of counsel.  The state courts' denial of relief was neither contrary to nor an unreasonable application of federal law.  Smith is not entitled to relief on these claims.

## F.  First Amendment Freedom of Expression

Petitioner next contends that the trial court's admission of the rap videos violated his First Amendment Right to freedom of expression.

Petitioner raised this claim in his application for post-conviction relief.  The trial court, in denying the claim, explained as follows:

> The defendant is correct that he had a constitutional right to free speech and expression which he chose to exercise by way of rap music videos.  The state did nothing to interfere with his free exercise of those rights.  What the state did do, however, was point out to the jury that the defendant, in the exercise of his rights of free speech and expression, bragged about, and thus confirmed, his participation in criminal activity.  To suggest that the defendant was free to talk or sing about his criminal activities, and that the state could not later use those free expressions to convict him of the criminal activities because their use somehow infringed on his First Amendment rights of speech and expression, is absurd.
>     The defendant's second assignment of error regarding the rap music videos was fully considered by the First Circuit Court of Appeal.  Article 930.4(A) of the Louisiana Code of Criminal Procedure provides that, unless required in the interest of justice, no claim in any application for post conviction relief shall be considered by the court if such claim was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence.  This court does not believe the interests of justice require reconsideration of his claim by the defendant.[211]

---

[210] State Rec., Vol. 1 of 4 , hearing transcript of September 14 , 22011, pp. 12-14, 17-18.
[211] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 8-9.

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[212]  The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[213]

In Dawson v. Delaware, 503 U.S. 159, 165 (1992), the United States Supreme Court held that "the Constitution does not erect a *per se* barrier to the admission of evidence" protected by "The First Amendment."  Further, the First Amendment does not prohibit the introduction of relevant evidence.  Id. at 164-68.  Here, the evidence of the rap videos was relevant to whether Smith had an intention to distribute the prescription medication.  One of the rap's lyrics involved Smith traveling to Houston to purchase drugs for resale.  In a second video, Smith claimed that they really did the things they rapped about.  Certainly, the lyrics and statements in the video tended to show that petitioner was guilty of the offenses charged.  See Amati v. Crawford, No. 3:04-CV-00138-PMP-(VPC), 2007 WL 9677076, at *3 (D. Nev. Sept. 21, 2007) (admission in a murder case of rap lyrics by that petitioner that "[n]ow I stand with frustration in my hand, shouldn't have pulled the trigger and killed that man" were relevant and the Nevada Supreme Court's finding that the admission did not violate the First Amendment was not contrary to or an unreasonable application of United States Supreme Court law.)

For the foregoing reasons, petitioner has not shown that the state courts' denial of relief was contrary to or an unreasonable application of law as established by the United States Supreme Court.  He is not entitled to relief as to this claim.

## G.  Prosecutorial Misconduct

Petitioner claims that the prosecutor lied during opening statements when he told the jury he did not know what Pierce would say during his testimony and that no deals had been made,

---

[212] State v. Smith, No. 2016 KW 1486, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[213] State ex rel. Smith, 249 So. 3d at 824; State Rec., Vol. 4 of 4.

used perjury in the case, threated and intimidated witnesses, and was overzealous by yelling at

Smith while he testified on the stand, resulting in a violation of his right to a fair trial.

During opening statements, the prosecutor explained that Pierce and DeHart also had been

arrested and stated:

> Now, the testimony you'll hear in this case, in addition to the troopers who
> were also involved, Jason Pierce. He's been ordered by the court to testify. He has
> not been promised anything regardless of what you may hear, regardless of the
> claims that may be made. He has not been promised anything by anyone, myself,
> Mr. Lyons, District Attorney Joe Waitz, anyone for his testimony. Again, his day
> in court is coming as well.
>   I don't know exactly what he is going to testify to. I can't be certain exactly
> what he is going to testify to.
>   But as I appreciate it, you're going to hear evidence in this case that the
> defendant orchestrated trips to Texas for the purpose of getting prescriptive
> medication and then ultimately for resale in our area.
>   You should also hear testimony in this case that multiple times, on multiple
> times these trips were taken to Texas. They went to multiple doctors. Had
> prescriptions filled. Went to different pharmacies in Texas.
>   And again, can't be certain what he'll testify to but I assume it will be along
> those lines.
>   And in addition, you'll also hear that he helped set up the exchanges, that
> Clyde Smith paid Mr. Pierce for his services in pain pills, or pills. We know what's
> going on here, Ladies and Gentlemen. It will be clearly obvious to you.
>   You'll hear testimony from Mr. Pierce, possibly some other testimony from
> Mr. Smith's friends, if you will.[214]

When cross-examining petitioner about their trip back from Houston, the prosecutor

apparently raised his voice and was admonished by the trial court.[215]

Petitioner raised these claims in his application for post-conviction relief. The trial court,

in rejecting the claims, explained:

> The defendant has not pointed to any evidence to show the prosecutor lied
> to the jury when he told the jury that he did not know what Jason Pierce would say
> when he took the stand. During his opening statement, the prosecutor's exact words
> to the jury regarding the testimony of Jason Pierce were as follows:

---

[214] State Rec. Vol. 2 of 4, trial transcript of May 24, 2011, pp. 254-255.
[215] State Rec., Vol. 2 of 4, trial transcript of May 26, 2011, pp. 52-53.

"I don't know exactly what he is going to testify to.  I can't be certain exactly what he is going to testify to….And again, can't be certain what he'll testify to but I assume it will be along those lines."
(Transcript, May 24, 2011, p. 255, lines 3-17.)

In the absence of evidence that the witness conspired with the prosecutor to recite some memorized lines in response to the prosecutor's questions, it is ludicrous to suggest that the above-quoted remarks to the jury by the prosecutor amounted to lies.  Additionally, the defendant has not revealed any evidence to show that the witness, Jason Pierce, in fact reached a deal with the state prior to his testimony to receive some advantage in exchange for his testimony.

The defendant is correct that the court admonished the prosecutor when he raised his voice to Mr. Smith during the states' cross examination of him.  The prosecutor's heightened tone of disbelief was precipitated by the defendant's suggestion that the other occupants of his vehicle had eaten the prescription pills that had all gone to Texas to purchase for distribution.  The pertinent exchange is reflected by the following extract from the trial transcript:

MS MCNABB: Everyone's talking at one time.  This witness is not yelling at Mr. Dagate, and I don't think Mr. Dagate should be yelling at the witness.  There's a microphone right there

THE COURT: Okay, you've made your point.

MS MCNABB: Even I can hear everything he said without the microphone.

THE COURT:  You've made your point.

MS. MCNABB: Thank you.

THE COURT:  Mr. Dagate, there's no need to get too loud.  Go ahead.  I realize that you're passionate about what you're asking, but you can tone it down.
(Transcript, May 26, 2011, p. 53, lines 10-29)

It cannot be reasonably argued that this exchange reflected prosecutorial misconduct which in any way approached a level that would have constituted a violation of the defendant's right to a fair trial.  This assignment of error by the defendant has no merit.[216]

---

[216] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 16-18.

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[217] The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[218]

A prosecutor's comment does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the trial was rendered fundamentally unfair in violation of the Due Process Clause. Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations and quotations omitted); accord Rogers v. Lynaugh, 848 F.2d 606, 608 (5th Cir. 1988); Bell v. Lynaugh, 828 F.2d 1085, 1095 (5th Cir. 1987). The prosecutor's remarks must be evaluated in the context of the entire trial. Greer v. Miller, 483 U.S. 756, 765–66 (1987) (citing Darden, 477 U.S. at 179); Kirkpatrick v. Blackburn, 777 F.2d 272, 281 (5th Cir. 1985).

District courts in the Fifth Circuit must apply a two-step analysis when reviewing claims of prosecutorial misconduct. United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000); United States v. Lankford, 196 F.3d 563, 574 (5th Cir. 1999). First, the court must determine whether the prosecutor made an improper remark. Wise, 221 F.3d at 152. "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant." Id. A habeas corpus petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks." Jones, 864 F.2d at 356; accord Hogue v. Scott, 874 F.Supp. 1486, 1533 (N.D. Tex. 1994). Under this test, a petitioner must demonstrate that the

---

[217] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[218] State ex rel. Smith, 249 So. 3d at 824; State Rec., Vol. 4 of 4.

comment rendered his trial "fundamentally unfair," by showing "a reasonable probability that the verdict might have been different had the trial been properly conducted." Rogers, 848 F.2d at 609 (footnote and citations omitted). "In attempting to establish that a prosecutor's improper comments constitute reversible error, the criminal defendant bears a substantial burden." United States v. Virgen-Moreno, 265 F.3d 276, 290 (5th Cir. 2001) (citing United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th Cir. 1990)). When determining the effect of the prosecutors' impermissible comments, this Court considers three factors: "the magnitude of the prejudicial effect of the remark, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt." United States v. Bermea, 30 F.3d 1539, 1563 (5th Cir. 1994), cert. denied, 513 U.S. 1156, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995); United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994).

Here the prosecution's opening statement was in accordance with Louisiana law, which provides that "The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge." La. Code Crim. P. art. 766. At no point did the prosecutor say he did not know what Pierce's testimony would be; rather, he twice stated that he did not know "exactly" what Pierce's testimony would be. He reiterated that he could not be "certain" as to what Pierce would say, but explained what he expected the testimony to show. There was nothing improper about the statement. Further, the trial court instructed the jury that opening statements were not evidence and should not be considered as such.[219]

Petitioner's claim relating to the alleged "deal" and suborning perjury overlap with claims K. and L. and are fully addressed in those sections.

---

[219] State Rec., Vol. 2 of 4, trial transcript of May 24, 2011, pp. .238-239.

While the record reflects that the prosecutor, at one point during questioning of petitioner, became passionate and raised his voice or yelled during questioning, the outburst was brief, and the trial court admonished the prosecutor. Given that the conduct was not persistent, the admonishment by the trial court, and the strength of the evidence against petitioner, he has not met his burden of showing that the outburst rendered his trial fundamentally unfair.

As for his claim that the prosecutor threatened and/or coerced the witnesses to testify against him, petitioner does not explain which witnesses were allegedly threatened. Nor does petitioner make any specific allegations as to what the prosecutor allegedly said to the witnesses to coerce them to testify against him. He has not provided any support whatsoever for his allegations that the prosecution actually threatened or coerced any witnesses. None of the witnesses testified at trial that they had been coerced or threatened to testify against petitioner. Petitioner has not provided affidavits from any of the witnesses supporting a claim that they were threatened. Smith simply has not established that any threats were ever made and therefore fails to satisfy his burden of proof. Brooks v. Cain, Civ. Action No. 05–3004, 2007 WL 2900291, at *7 (E.D. La. Sept. 27, 2007).

Smith has not shown that the state courts' denial of relief was contrary to or an unreasonable application of law as established by the United States Supreme Court. He is not entitled to relief as to these claims.

### H.  Due Process Errors Made by the Trial Court

Petitioner next claims that he was prejudiced by the errors made by the trial court. He specifically claims, "At trial there were eight unrecorded bench conferences at critical points in the testimony which resulted in an incomplete record for appeal. The recording of the bench conferences is the responsibility of the trial court and was not done eight separate times. Also,

only one time when excusing the jury for the day during the four day trial, did the court admonish the jury not to speak to anyone about the trial. The court is required the admonish the jury whenever recessing the proceedings."[220]

Petitioner raised these claims in his application for post-conviction relief. The trial court found the claims groundless, explaining:

> The defendant has not alleged, and has not pointed to any evidence, that the bench conferences to which he alludes prejudiced him in any way. Furthermore, the defendant is simply incorrect that the court was required to admonish the jury not to discuss the trial proceedings each and every time the court recessed during his trial. He is also incorrect that the court admonished the jury in that regard one once. The court advised the jurors selected at the end of the first day of jury selection not to discuss the case with anyone, but then so admonished the jury in great detail before opening statements after all the jurors had been selected. (Transcript, May 24, 2011, p. 242, line 11, through p. 23, line 31). Finally, the defendant has not pointed to any evidence that the jurors, in fact, discussed any trial matters in violation of the court's admonition.
> This error is groundless.[221]

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[222] The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[223]

Initially, petitioner cites no law to support his claims. The Court acknowledges that in State v. Pinion, 968 So.2d 131, 136 (La. 2007) (per curiam), the Louisiana Supreme Court found that bench conferences are a material part of the proceedings and the omission of the bench conference, during which challenges for cause and peremptory challenges were made, required reversal of the defendant's conviction and sentence where it was reasonably likely that defense counsel had exhausted his peremptory challenges and it was uncertain how many cause challenges

---

[220] Rec. Doc. 1-2, p. 31.
[221] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, p. 18.
[222] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[223] State ex rel. Smith, 249 So. 3d at 824; State Rec., Vol. 4 of 4.

the defense made unsuccessfully and there was no other record accounting for the jury selection process.  To the extent Smith raises his issue regarding the failure to record bench conferences as a violation of state law, his claim must fail.  Federal habeas review may only consider constitutional violations and noncompliance with federal law as interpreted by the United States Supreme Court.  See Swarthout v. Cooke, 562 U.S. 216, 219, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011).  The Court cannot provide habeas relief based on Pinion.  Greer v. Warden, La. State Penitentiary, Civ. Action. No. 11-cv-1727, 2014 WL 4387295, at *9 (W.D. La. Mar. 15. 2015); Hedgesperth v. Warden, La. State Penitentiary, Civ. Action No. 11-cv-2078, 2015 WL 1089325, at *6 (W.D. La. Mar. 5, 2015).

Smith does state that the failure to transcribe bench conferences violated his right to due process.  As a result, he has stated a cognizable claim for federal habeas review.  See Griffin v. Illinois, 351 U.S. 12, 19–21, 76 S.Ct. 585, 100 L.Ed. 891 (1956).  Assuming he claims the incomplete trial transcript denied him complete appellate review, it is indisputably true that a criminal defendant has the right to adequate appellate and other review of his conviction based upon a sufficiently complete and accurate record.  Mayer v. City of Chicago, 404 U.S. 189, 198, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971).  However, the Supreme Court has not held that due process requires a verbatim transcript of the entire proceedings or that an incomplete record confers automatic entitlement to relief.  In any event, to prevail on a claim that the record was inadequate, a petitioner must prove that the missing portion of the transcript actually prejudiced his appeal in some manner.  Green v. Johnson, 160 F.3d 1029, 1045 (5th Cir. 1998) ("[B]arring a showing that the [failure to record bench conferences during trial] resulted in 'actual prejudice,' habeas relief is unwarranted." (citation omitted)); see also Mullen v. Blackburn, 808 F.2d 1143, 1146 (5th Cir. 1987) (finding petitioner failed to show the absence of voir dire transcript prejudiced his appeal);

Bozeman v. Cain, Civ. Action No. 09-8423, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), adopted, 2010 WL 2977402 (E.D. La. July 20, 2010) (finding that petitioner's claim failed when there was no actual prejudice resulting from the failure to transcribe a bench conference).  Smith has made no such showing of prejudice in this case.  On the contrary, the record was adequate for resolution of the claims that were actually asserted on appeal.  Where, as here, the missing portions of the transcript were immaterial to the claims asserted on appeal, the record was adequate for full appellate review, and there was no denial of a meaningful appeal.  See Schwander v. Blackburn, 750 F.2d 494, 497–98 (5th Cir. 1985) (explaining that petitioner was not denied a meaningful appeal where the omitted portions of the trial transcript were immaterial to the error alleged on direct appeal); Thomas v. Cain, Civ. Action No. 12-2818, 2013 WL 5960808, at *5 (E.D. La. Nov. 6, 2013) (finding that the record was adequate for resolution of appellate claims).

Further, Smith fails to point to the any particular ruling he would like to challenge nor has he alleged any prejudice from the rulings.  Essentially, he is requesting a more complete record in order to find potential constitutional errors, not to support specific errors he has already clearly identified.  It is well-settled that the State is not "required to furnish complete transcripts so that the defendants ... may conduct 'fishing expeditions' to seek out possible errors at trial."  Jackson v. Estelle, 672 F.2d 505, 506 (5th Cir. 1982).  As such, Smith has not met his burden to prove that relief is warranted.  See, e.g., Johnson v. Cooper, Civ Action No. 12-2818, 2013 WL 4548526, at *8 (E.D. La. Aug. 27, 2013) ("Without a specific issue or ruling that is contained in the bench transcript to appeal, his claim lacks a relevant issue that would trigger a duty upon the State to provide him the transcript.").

As for his claim that the trial court failed to instruct the jury not to discuss the case each time they were excused from the court room, Smith again has not cited any law, let alone United

States Supreme Court precedent, which requires such an instruction each time the jury is excused from the court room.  Also, the trial court advised at length the jurors who were picked from the first panel to not discuss the case with anyone, including each other, family and friends and not read anything about it or listen to any news broadcast.[224]  When two jurors were selected from the second panel, he advised them not to discuss the case with anyone, including their fellow jurors.[225]  Prior to opening statements, the trial court addressed the entire jury that, until they retired to deliberate, they were ordered not to discuss any aspect of the trial or the case with any other members of the jury or any other person.[226]  At the end of the case, in its final instruction, the trial court reminded the jurors that it had ordered them at the beginning of the case not to discuss it among themselves, but that it was now removing that restriction so they could deliberate.[227]

Smith has not shown that the state courts' denial of relief was contrary to or an unreasonable application of law as established by the United States Supreme Court.  He is not entitled to relief as to these claims.

## I.  Ineffective Assistance of Appellate Counsel

Petitioner next contends he received ineffective assistance of appellate counsel.  First, he re-raises Thomas's failure to appear at the hearing on the post-trial motions.  Then he claims ineffective assistance of appellate counsel based his counsel's failure to raise "key issues in his brief and he failed to raise arguments and case in support of his one issue, insufficient evidence."[228]  He specifically claims counsel failed to address cases showing that he had overcome the burden

---

[224] State Rec., Vol. 1 of 4, trial transcript of May 23, 2011, pp. 197-199.
[225] State Rec., Vol. 2 of 4, trial transcript of May 24, 2011, p. 130
[226] Id., at p. 240.
[227] State Rec., Vol 2 of 4, trial transcript of May 26, 2011, p. 133.
[228] Rec. Doc. 1-2, p. 32.

of showing that he had lawful possession of prescription medications. He further claims his lawyer

failed to raise the issues relating to the denial of the motion to quash and the motion to suppress.

In denying these claims raised in his post-conviction application, the state district court

found:

> In his final original assignment of error, the defendant complains that his appellate counsel, John Thomas, was ineffective because he failed to appear to argue post trial motions, and failed to address certain issues in denying his motion to quash the bill of information and his motion to suppress, and that the evidence at trial was insufficient to support the jury verdicts.
>
> As pointed out above, claims of ineffective assistance of counsel are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.ED2D 674 (1984). In order to prevail, the defendant must show both that (1) counsel's performance was deficient and (2) he was prejudiced by the deficiency. With regard to the second element, i.e., prejudice, the defendant must show that any other error was so serious as to deprive him of a fair trial or other proceeding. To carry this burden, the defendant must show that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. This standard of review applies to allegations of ineffective assistance of counsel lodged against appellate counsel as well as trial counsel.
>
> Mr. Thomas' failure to argue the defendant's post trial motions had been addressed hereinabove. If Mr. Thomas had appeared to argue the merits of the post trial motions instead of Ms. McNabb, the court's rulings would not have been any different. Any deficient performance by Mr. Thomas in his regard did not cause the defendant any prejudice.
>
> Likewise, any failure by Mr. Thomas' to adequately present Mr. Smith's claims to the Louisiana First Circuit Court of Appeal did not ultimately cause Mr. Smith any prejudice. His motion to suppress and his motion to quash were properly denied by this court after contradictory hearings. His complaint that the evidence offered at trial was insufficient to convict him was considered by the Court of Appeal and found to be groundless. The defendant has not directed this court to any law or evidence that Mr. Thomas could have presented that would have changed the results of these rulings. It is clear he was not prejudiced by lack of effort, if any, on the part of Mr. Thomas. No relief will be granted with regard to this post conviction claim by the defendant.[229]

The Louisiana First Circuit found that petitioner failed to meet his burden of proving the

outcome of his appeal would have been different, citing, Strickland.[230] The Louisiana Supreme

---

[229] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 18-19.
[230] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.

Court similarly found he failed to show he received ineffective assistance of counsel under Strickland.[231]

Here, the state courts correctly identified the clearly established federal law governing ineffective assistance of counsel claims: Strickland v. Washington, 466 U.S. 668 (1984). As the state court noted, Strickland established a two-part test for evaluating such claims. Specifically, a petitioner seeking relief must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. Id. at 697. A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a

---

[231] State ex rel. Smith, 249 So. 3d at 824; State Rec., Vol. 4 of 4.

wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, see also Williams v. Thaler, 602 F.3d 291, 310 (5th Cir. 2010).  Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." Day v. Quarterman, 566 F.3d 527, 536 (5th Cir. 2009) (quoting Strickland, 466 U.S. at 693). In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (quoting Strickland, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. Harrington, 562 U.S. at 112.

In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett v. McCotter, 796 F.2d 787, 793 (5th Cir. 1986).  Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief.  See Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000) (citing Ross v. Estelle, 694 F.2d 1008, 1012 (5th Cir. 1983)).

Because ineffective assistance of counsel claims present mixed questions of law and fact, this Court must defer to the state court decision rejecting such claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court has

explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of

counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then

explained:

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is*

*doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (citations omitted; emphasis added).  Therefore, on a habeas review of an ineffective

assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the

benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation

marks omitted).

It is clear that appellate counsel "is not obligated to urge on appeal every nonfrivolous issue

that might be raised (not even those requested by defendant)."  <u>West v. Johnson</u>, 92 F.3d 1385,

1396 (5th Cir. 1996).  Rather, "[e]xperienced advocates since time beyond memory have

emphasized the importance of winnowing out weaker arguments on appeal and focusing on one

central issue if possible, or at most on a few key issues."  <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52,

103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).  Far from evidencing ineffectiveness, an appellate

counsel's restraint often benefits his client because "a brief that raises every colorable issue runs

the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions."

<u>Id.</u> at 753, 103 S.Ct. 3308.  Rather, the applicable test to be applied in assessing such a claim is

instead whether the issue ignored by appellate counsel was "clearly stronger" than the issues

actually presented on appeal.  <u>See, e.g.</u>, <u>Diaz v. Quarterman</u>, 228 Fed. App'x 417, 427 (5th Cir.

2007); <u>accord</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

On appeal, appellate counsel argued: (1) the evidence adduced at trial was insufficient to

sustain the defendant's convictions beyond a reasonable doubt; (2) the trial court abused its

discretion in denying the defense's <u>Batson</u> challenge to the prosecution's exclusion of African

American jurors; (3) the trial court erred in denying the defense's motion in limine to exclude the

state's introduction of a "gangster rap" video in which Smith was heard rapping about traveling to Texas to purchase prescription drugs to re-sell; and (4) Smith's total sentence of thirty years at hard labor under La. R.S. 15:529.1 was constitutionally excessive.[232]  With regard to the first issue, appellate counsel attacked the credibility of Pierce's testimony and pointed out that Smith had legally obtained the medication and had medical records documenting his need for the medications and that his testimony was corroborated by Pontiff.  He argued that, at best, the state presented a circumstantial case suggesting guilt.  As previously explained in detail, the Louisiana First Circuit addressed this claim and found it to be meritless.

Petitioner offers no support as to how his counsel's presentation of his insufficiency of the evidence claim on appeal was inadequate or how he should have couched the claim differently. While the claim was ultimately found to be without merit, petitioner fails to establish a reasonable probability that, but for the manner in which his counsel addressed the issue on direct appeal, he would have prevailed on appeal.

As for his claims that appellate counsel was ineffective in failing to raise the denial of the motion to quash and the motion to suppress on appeal, petitioner has failed to show these claims were "clearly stronger" than the other claims raised.

Defense counsel filed a motion to suppress evidence obtained during the search of the vehicle claiming it was unlawful.[233]  Defense counsel also filed a motion to quash the bill of information on the grounds that petitioner was in lawful possession of Hydrocodone and Xanax prescribed by a practicing doctor and lawfully filled at a pharmacy.[234]  The trial court reserved ruling until the end of the trial.[235]  After the jury retired to deliberate, the trial court overruled the

---

[232] State Rec., Vol. 3 of 4, appellate brief, 2012-KA-1560, filed October 12, 2015.
[233] State Rec., Vol. 1 of 4, Defendant's Motion to Suppress filed May 13, 2011.
[234] State Rec., Vol. 1 of 4, Defendant's Motion and Order to Quash Amended Bill of Information filed May 13, 2011.
[235] State Rec., Vol. 1 of 4, trial transcript of May 23, 2011, p. 7.

motion to quash finding that there was evidence upon which the jury could find petitioner possessed the substances without a valid prescription and "[p]articularly and specifically there is evidence upon which the jury could conclude that the defendant possessed those substances prescribed to Mr. Pierce and/or Mrs. DeHart, or Ms. DeHart."[236]

The trial court held a hearing on the motion to suppress.[237]  Trooper Christopher Mason testified he observed a vehicle traveling at a high rate of speed and used his radar to determine that the vehicle was traveling 89 miles per hour in a 70 mile per hour zone.[238]  He pulled the vehicle over and determined Smith was driving.[239]  When Smith and the passengers gave conflicting stories about where they were coming from, Mason called for backup.[240]  DeHart ultimately identified the vehicle as belonging to her and consented to the search of the vehicle, after which a search was conducted.[241]  Mason arrested Smith for speeding, having no driver's license, and possession with intent to distribute Hydrocodone (Lortab) and Xanax.[242]

Trooper Michael Stewart testified that he assisted with the traffic stop.[243]  He testified that one of the female passengers indicated the vehicle was hers and that they obtained verbal consent to search the vehicle.[244]

DeHart testified that the vehicle Smith was driving was hers although it was registered in her grandparents' names due to her bad credit.[245]  She explained she paid the note and the insurance

---

[236] State Rec., Vol. 2 of 4, trial transcript of May 26, 2011, p. 144.
[237] State Rec., Vol. 1 of 4, trial transcript of May 23, 2011, pp. 48-79.
[238] Id., at pp. 49-50, 62.
[239] Id., at p. 52.
[240] Id., at pp. 53 -54, 59.
[241] Id., at pp. 54-55, 59, 61.
[242] Id., at pp. 63-64.
[243] Id., at p. 56.
[244] Id., at pp. 68, 71.
[245] Id., at p. 76.

on the vehicle.[246]  She admitted that she told the Trooper it was her car and that Smith was driving the car with her permission.[247]

The trial court found there was probable cause to stop the vehicle and arrest Smith in light of the speeding.[248]  The trial court further found that while DeHart was not the title owner, she was the equitable owner of the car due to the arrangement she had with her family and that she gave permission to search the car.[249]  The trial court found that the search and seizure were not illegal and denied the motion to suppress.[250]

Petitioner has not shown that the trial court's denial of the motion to suppress, based upon the Trooper's reasonable suspicion that the driver was violating the law by speeding, and the subsequent search voluntarily permitted by the equitable owner of the car was "clearly stronger" than the issues raised on appeal.

As for the motion to quash, certainly, petitioner did not have a prescription for the medications that were in Pierce and DeHart's names.  Petitioner presented evidence that Hydrocodone and Xanax were prescribed to him by a physician.  However, La. Rev. Stat. § 40:961(33) provides the following:

> "Prescription" means a written request for a drug or therapeutic aid issued by a licensed physician, dentist, veterinarian, osteopath, or podiatrist for a *legitimate medical purpose*, for the purpose of correcting a physical, mental, or bodily ailment, and *acting in good faith in the usual course of his professional practice*.

(Emphasis added).  The trial court found there was sufficient evidence for the jury to find that the prescriptions were not valid.  For the reasons explained in section A., the jury was entitled to reject the evidence by petitioner that he obtained the prescriptions for a legitimate medical purpose and

---

[246] Id., at p. 76.
[247] Id., at p. 77.
[248] Id., at pp. 78-79.
[249] Id., at pp. 79-80.
[250] Id., at p. 80.

credit the evidence that petitioner was "doctor shopping" and planned to distribute the medication. For these reasons, petitioner has not shown that this issue was "clearly stronger" than those raised by appellate counsel on appeal.

Petitioner has not demonstrated that the state courts' decision rejecting this ineffective assistance of appellate counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### J.  Other Crimes Evidence

Petitioner claims that Pierce was allowed to testify regarding other legal purchases made on dates other than that alleged in the amended bill of information as well as Smith's threats to Pierce without notice and without the trial court giving a final charge to the jury which explained the limited use of evidence in violation of State v. Prieur, 277 So. 2d 126, (La. 1973).  He also quotes certain trial testimony by Trooper Rhodes and Pontiff.[251]

Prior to trial, the state filed a notice of intent to use evidence of other crimes, including evidence that Smith and Pierce had traveled to Texas on at least two other occasions to obtain medications which they ultimately distributed in Louisiana.[252]  Defense counsel sought disclosure of "other crimes" evidence that the prosecution intended to use at trial under Prieur and filed a motion in limine to prohibit the introduction of such evidence.[253]  On May 24, 2011, in a separate filing, the state advised of its intent to use statements by petitioner threatening the life of Pierce while they were in jail.[254]

---

[251] Rec. Doc. 1-2, pp. 35-36, 41-42.
[252] State Rec., Vol. 1 of 4, Notice of the State's Intent to Use Evidence of Other Crimes filed May 9, 2011.
[253] State Rec., Vol. 1 of 4, Defendant's Motion and Order for Pretrial Disclosure of Similar Offenses Pursuant to Prieur, and Motion in Limine to Prohibit Introduction of Evidence of Other Crimes/Bad Character filed May 19, 2011.
[254] State Rec., Vol. 1 of 4, Amended Notice of Intent to Use Inculpatory Statement and/or Confession filed May 24, 2011.

The trial court addressed the majority of these filings prior to jury selection on May 23, 2011.[255]  The prosecution explained that Pierce would testify about prior trips to Texas to obtain medication to sell in Louisiana and that Pierce would sometimes help make arrangement to sell the medication and give the proceeds to petitioner in return for prescription medication.[256]  The prosecution further advised that Pierce would testify that, on the night of the stop, there were more prescription medications, in a secret compartment of a pineapple juice container and that the purpose of all this testimony was to show proof of a system, plan, knowledge and intent.[257]  The trial court found that there was sufficient notice of intent of the evidence to be offered and that it was admissible to show knowledge, plan, intent, and system on Smith's part.[258]

Pierce testified that he and Smith and several others had previously gone to Texas on at least two other occasions to obtain medication and that Smith paid him in pills.[259]  He testified that he previously witnessed Smith sell pills to "Tommy" on one occasion.[260]  He testified that on the occasion they were stopped by the trooper, some pills were hidden in a false bottom of a pineapple juice container.[261]  Pierce also testified that Smith threatened him while they were in jail.[262]  Defense counsel did not object to the testimony regarding threats, but rather chose to cross-examine Pierce about that testimony.[263]

Smith raised this issue on post conviction relief.  The trial court, in finding petitioner was not entitled to relief as to this issue explained:

> In his first supplemental post conviction claim, the defendant alleges he was denied a fair trial because the state used other crimes evidence against him without

---

[255] State Rec., Vol. 1 of 4, trial transcript of May 23, 2011, pp. 8-12.
[256] Id., at pp. 9-12.
[257] Id., at pp. 10-12.
[258] Id., at p. 12.
[259] State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, pp. 116, 120, 135, 153.
[260] Id., at pp. 136, 152.
[261] Id., at pp. 124-126.
[262] Id., at pp. 132, 147-148.
[263] Id.

notice and that the court failed to advise the jury of the limited purpose for which such evidence could be used.

The court has reviewed the entirety of the testimony of the three trial witnesses on whose testimony the defendant bases his claim, to wit, Trooper Craig Rhodes, Jason Pierce, and Christian Pontiff. Trooper Rhodes and Jason Pierce were called as state witnesses. Christian Pontiff, the defendant's fiancé [sic], was called by the defense.

Trooper Rhodes, a narcotics investigator for the Louisiana State Police, testified as an expert in the field of distribution of controlled dangerous substances, including prescription medication. At no time during direct examination by the witness did the state or the witness make any reference to any other criminal activity or bad acts of the defendant. Likewise, no such references were made during the cross examination by McNabb, or the redirect examination by the prosecutor. The witness' only reference to criminal activity dealt with the actions of the defendant and his friends regarding the crimes for which Mr. Smith was on trial, not other crimes or other bad actions.

During the direct testimony of Jason Pierce, the only references to other criminal activity by the defendant were statements by Mr. Pierce that he and the defendant had gone to Texas on prior occasions together to buy prescription medicine to distribute illegally, (Transcript, May 25, 2011, p. 114, lines 5-19; p. 117, lines 4-32; p. 129, lines 11-16), and a threat made to the witness by Mr. Smith while both were incarcerated.

The direct testimony of the defendant's first witness, Christian Pontiff, did not include any reference to any prior criminal activity of the defendant of which she was aware.

Based on the foregoing, it is clear that Jason Pierce provided the only testimony regarding prior criminal acts by the defendant. The defendant claims he did not have prior notice of this evidence contrary to the requirements of law, and that the court failed to admonish the jury as to the proper consideration of such evidence. Other than these procedural complaints, the defendant has not suggested that the evidence was not otherwise admissible.

The court notes that the defendant filed a pre-trial motion styled as "Defendant's Motion and Order for Pretrial Disclosure of Similar Offenses Pursuant to Prieur, and Motion in Limine to Prohibit Introduction of Evidence of Other Crimes/Bad Character." A hearing on this motion was conducted on May 23, 2011, before trial commenced. It is absolutely clear that during that hearing the state left no doubt that it intended to offer evidence of the defendant's prior criminal activity regarding the purchase and sale of prescription drugs under almost identical circumstances to those in the case in chief. The court found the evidence admissible under the dictates of Louisiana Code of Evidence article 404(B). Despite the defendant's protest, it is clear the evidence to which he now objects was admissible under Louisiana Code of Evidence article 404(B) "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident," or because "it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding."

A review of the transcript of the pre-trial hearing, however, does not reveal that the defendant was given notice at that hearing of the state's intent to offer evidence of the defendant's threat against Mr. Pierce made while they were incarcerated together. However, the record does reflect that on May 24, 2011, the day after the pretrial-hearing and the day before Pierce testified, defense counsel was given written noticed by the state of its intent to use as evidence "all statements made by the defendant to Jason Pierce, including verbal statements made by the defendant threatening the life of Jason Pierce…." When Mr. Pierce was prompted by the state during direct examination to testify about the threat, there was no objection from defense counsel. The evidence clearly was admissible and any objection to its admission would have been overruled.

The court notes that contrary to the defendant's allegation, the jury was specifically instructed by the court prior to deliberations as follows:

"Remember, the defendant Clyde Smith, is on trial today only for the for the offenses charged, that is, possession with intent to distribute hydrocodone, possession with the intent to distribute alprazolam, and possession with the intent to distribute carisprodal. You may not find him guilty of one or more of these offenses just because you believe he may have committed some other criminal offense or some other bad act at another place or time."

This first supplemental assignment of error by the defendant is without merit.[264]

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[265] The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[266]

As previously explained, "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little, 162 F.3d at 862. Therefore, to the extent that petitioner is arguing that the state courts misapplied state evidence law, his claim simply is not reviewable in this federal proceeding. Federal courts will not review the propriety of state-court evidentiary rulings unless the alleged error renders the criminal proceeding so fundamentally unfair as to violate due process. Lisenba v. People of the State of California, 314 U.S. 219, 236–37 (1941); Peters v. Whitley, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas review is proper only to

---

[264] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 19-22.
[265] Smith, No. 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[266] State ex rel. Smith, 249 So.3d at 824; State Rec. Vol. 4 of 4.

determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.).  In keeping with this principle, the United States Court of Appeals for the Fifth Circuit has stated that a petitioner can obtain federal habeas corpus relief only if evidence is erroneously admitted and "played a crucial, critical, and highly significant role in the trial."  Gonzales, 643 F.3d at 430 (quotation omitted).  Under this standard, a habeas petitioner must establish that the evidence was both erroneously admitted and prejudicial. McClain v. Cain, Civil Action No. 14-1452, 2015 WL 4509666, at *13 (E.D. La. July 24, 2015).

Whether evidence is admitted or excluded contrary to the Due Process Clause is a mixed question of law and fact.  Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997); see Wilkerson v. Cain, 233 F.3d 886, 890 (5th Cir. 2000) (issues of due process present mixed questions of law and fact.).  On habeas review, a federal court must determine if the state courts' denial of relief on the issue was contrary to or involved an unreasonable application of Supreme Court precedent.

Smith has not established a due-process violation for several reasons: (1) he has not shown any error in admitting the "other crimes" evidence; and (2) he has not identified any Supreme Court precedent in order to establish that the state courts' determination is contrary to, or an unreasonable application of, clearly established federal law.

First, a review of the testimony of Trooper Rhodes and Pontiff demonstrates that neither testified about "other crimes" committed by Smith.[267]  Rhodes's testimony was solely related to his investigation of the actions of Smith and his co-defendants on December 22 and 23, 2010.[268]

---

[267] State Rec. Vol. 2 of 4, trial transcript of May 24, 2011, pp. 303-312 (Rhodes); State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, pp. 6-71 (Rhodes), 167-186 (Pontiff).

[268] State Rec. Vol. 2 of 4, trial transcript of May 24, 2011, pp. 303-312; State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, pp. 6-71.

Pontiff, who testified for the defense, similarly testified only about the events on those dates and testified that she was unaware of petitioner visiting any doctors in Houston prior to that date.[269]

Contrary to Smith's claim, as set forth above, he was in fact given written notice that the state intended to introduce testimony through Pierce that Smith had traveled to Houston to obtain medication for resale on at least two other occasions and that Smith had threatened Pierce while they were in jail. The trial court held a hearing regarding the admissibility of the "other crimes" evidence relating to petitioner's prior purchase and resale of prescription medication and found that evidence admissible.

Petitioner has not demonstrated that this "other crimes" evidence was erroneously admitted. The evidence was not admitted to impugn his character or depict him as a bad man. Instead, the evidence was independently relevant and properly admitted to aid in proving a material issue essential to the charges (i.e., the element of specific intent). As determined by the state courts, the evidence was plainly admissible under Louisiana law.

While the trial court did not hold a hearing regarding the admissibility of petitioner's threats made to Pierce, defense counsel did not object to the testimony and cross-examined Pierce about the alleged threats in an attempt to attack his credibility.[270] In any event, "evidence of threats to witnesses has been recognized as admissible other crimes evidence, because actions by the defendant that are designed to prevent witnesses from testifying give rise to an inference that the defendant acted from an awareness or consciousness of his own guilt." State v. Young, No. 2014 KA 1245, 2015 WL 2126805, at *7 (La. App. 1st Cir. May 6, 2015) (citing State v. Burnette, 353 So.2d 989, 991–92 (La. 1977)).

---

[269] State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, pp. 167-186.
[270] Id., at pp. 132-133, 146-148

Because Smith has not demonstrated any error in the admission of the evidence, he therefore "has no basis for any alleged due process violation." See McClain v. Cain, Civil Action No. 14-1452, 2015 WL 4509666, at *14 (E.D. La. July 24, 2015). Absent any grounds to support a due-process violation, Smith has failed to present a cognizable basis for federal habeas corpus relief.

Finally, petitioner's claim that the trial court failed to instruct the jury that he could only be convicted of the crimes charged in the bill of information is wholly false. As the trial court noted, the record, including the trial transcript and the jury instructions, demonstrate that the jury was advised that petitioner was on trial only for the offenses charged, and enumerated those offenses, and cautioned the jury "[y]ou may not find him guilty of one or more of these offenses just because you believe he may have committed some other criminal offense or some other bad act at another place or time."[271]

The state courts' ruling was not an unreasonable application of or in violation of any constitutional law as established by the United States Supreme Court. Petitioner is not entitled to relief as to this issue.

### K.    Prosecutor Vouched for Pierce's Credibility

Petitioner next claims that the prosecutor vouched for the credibility for Pierce by giving him accomplice immunity.

Petitioner raised this claim in his supplemental application for post conviction relief. The trial court, denying relief, stating:

> The defendant correctly asserts that the state successfully offered into evidence at his trial during the testimony of Jason Pierce, the original court order commanding Jason Pierce to testify with benefit of immunity. He alleges that his act violated his right to a fair trial because it amounted to the state vouching for the

---

[271] State Rec. Vol. 1 of 4, Instructions to the Jury filed May 26, 2011, p. 4; State Rec., Vol. 2 of 4, trial transcript of May 26, 2011, pp. 118-119.

witness' credibility. The court suggests that a reasonable person might come to a different conclusion, i.e., that the witness' credibility is questionable because his testimony was not voluntary, but compelled. In any event, it is absurd to suggest that the defendant was denied a fair trial because the jury is made aware that his co-conspirator has been forced to testify under a grant of immunity.

This claim by the defendant has no merit.[272]

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[273] The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[274]

It is improper for a prosecutor to vouch for the credibility of a witness or to express an opinion as to the defendant's guilt if there is underlying an implication that the prosecutor's statements are based on additional personal knowledge about the witness or the facts of the case which are in not in evidence. See, e.g., United States v. Munoz, 150 F.3d 401, 414–15 (5th Cir.1998); Richthofen v. Cain, Civ. Action No. 05–5701, 2008 WL 630477, at *49 n. 81 (E.D. La. Mar. 7, 2008); Spicer v. Cain, Civ. Action No. 07–3770, 2007 WL 4532221, at *9 (E.D.La. Dec. 19, 2007). However, such comments are not improper where it is apparent to the jury that the comments are based on the evidence presented at trial rather than on personal knowledge of facts outside the record. See, e.g., Nichols v. Scott, 69 F.3d 1255, 1282–83 (5th Cir.1995); Richthofen, 2008 WL 630477, at *49 n. 81; Spicer, 2007 WL 4532221, at *9.

Prior to trial, the prosecution filed a motion to compel testimony of Pierce and requested an order pursuant to La. Code Crim. P. art. 439.1.[275] The trial court issued an order compelling Pierce to testify at petitioner's trial and providing "any information directly or indirectly derived from such testimony shall not be used against Jason Pierce in any criminal case except a

---

[272] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, p. 22.
[273] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[274] State ex rel. Smith, 249 So.3d at 824; State Rec. Vol. 4 of 4.
[275] State Rec., Vol. 1 of 4, Motion to Compel Testimony filed May 2, 2011.

prosecution for perjury, giving a false statement, or otherwise failing to comply with this Order."[276] The defense then filed a motion requesting disclosure of any deals that state had made or would make with any co-defendant or any other witness.[277]  Prior to jury selection, the trial court addressed the defense's motion.[278]  The prosecution explained that there was no deal between the District Attorney's Office and any co-defendant involved in petitioner's case  and that in order to force Pierce to testify, under La. Code Crim. P. art. 439.1(C), the state was forced to grant him immunity.[279]  Article 439.1(C) provides that where the court issues an order to an individual to provide testimony the individual refuses to give on the basis of his privilege against self-incrimination:

> The witness may not refuse to comply with the order on the basis of his privilege against self incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.

La. Code Crim. P. art. 439.1(C).

In this case, on direct examination, the prosecution questioned Pierce about a court order signed by the trial judge compelling him to testify at the trial.[280]  Pierce confirmed that the order directed that his testimony would not be used against him in any criminal case with the exception of the prosecution of perjury.[281]  The court order compelling Pierce to testify was admitted into evidence.[282]

---

[276] State Rec., Vol. 1 of 4, Order dated May 2, 2011.
[277] State Rec., Vol. 1 of 4, Defendant's Motion to Reveal Agreements to Testify and/or Plead filed May 13, 2011.
[278] State Rec., Vol. 1 of 4, trial transcript of May 23, 2011, pp. 4-6.
[279] Id.
[280] State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, pp. 109-110.
[281] Id., at p. 109.
[282] Id., at p. 110.

The defense had a full opportunity to address any issues relating to Pierce's credibility in cross-examination. In fact, the defense questioned Pierce about the immunity, and Pierce explained that his trial was the following week and the agreement provided that they could not use his testimony against him at that trial.[283] On re-direct, Pierce explained that he was testifying pursuant to an order to testify for the State of Louisiana and that his testimony could not be used against him at his own trial, just for a perjury charge.[284] The jury was allowed to assess the credibility and weight to be given to Pierce's testimony.

Petitioner fails to cite to any United States Supreme Court precedent holding that providing a witness with use immunity constitutes improper vouching on the part of the prosecution. The state courts' ruling was not an unreasonable application of or in violation of any constitutional law as established by the United States Supreme Court. Petitioner is not entitled to relief as to this issue.

### L.  Prosecutorial Misconduct-False Testimony

Petitioner next contends that the prosecutor violated his rights to a fair trial when he suppressed evidence that Pierce was promised a "deal" in exchange for his testimony. He further claims that the prosecutor allowed Pierce to perjure himself on the stand.

This claim was raised in petitioner's supplemental application for post conviction relief. The trial court, in denying relief, explained:

> [T]he defendant has not pointed to any extrinsic evidence that the witness, Jason Pierce, was, in fact, promised a deal by the state in exchange for his testimony. In connection with this claim, the defendant raises on mere speculation and innuendo. ...
> The court does note that on August 4, 2011, the witness Jason Pierce, pled guilty to four counts of possession of controlled dangerous substances as a result of the his arrest with the defendant, Smith. Mr. Pierce, who had no prior record of any felony conviction, was sentenced to four concurrent

---

[283] Id., at p. 149.
[284] Id., at pp. 156-157.

sentences of two years at hard labor, which sentences were suspended and he was placed on supervised probation for eighteen months.[285]

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[286] The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[287]

Because the state courts denied petitioner's <u>Brady</u> claim on the merits in the post-conviction proceedings, the AEDPA places severe limitations on this Court's review of the state court's decision. The United States Fifth Circuit Court of Appeals has explained:

> Under AEDPA, [a federal court] do[es] not decide de novo whether a state prisoner has sufficiently proven a <u>Brady</u> violation. <u>See Yarborough v. Alvar</u>ado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter."); <u>Neal v. Puckett</u>, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."). Rather, [a federal court] decide[s] whether the state court's <u>Brady</u> determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law. <u>Busby v. Dretke</u>, 359 F.3d 708, 717 (5th Cir. 2004).

<u>Dickson v. Quarterman</u>, 462 F.3d 470, 477-78 (5th Cir. 2006).

The clearly established federal law to be used in analyzing <u>Brady</u> claims is well known. As the United States Supreme Court held:

> "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u> [<u>v. Maryland</u>, 373 U.S. 83,] 87, 83 S.Ct. 1194, [10 L.Ed.2d 215 (1963)]. Evidence qualifies as material when there is " 'any reasonable likelihood' " it could have " 'affected the judgment of the jury.' " <u>Giglio</u> [<u>v. United States</u>, 405 U.S. 150,] 154, 92 S.Ct. 763, [31 L.Ed.2d 104 (1972)] (quoting <u>Napue v. Illinois</u>, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). To prevail on his <u>Brady</u> claim, [a petitioner] need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. <u>Smith v. Cain</u>, 565 U.S. 73, —— – ——, 132

---

[285] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, p. 23.
[286] <u>Smith</u>, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[287] <u>State ex rel. Smith</u>, 249 So.3d at 824; State Rec. Vol. 4 of 4.

> S.Ct. 627, 629-631, 181 L.Ed.2d 571 (2012) (internal quotation marks and brackets omitted). He must show only that the new evidence is sufficient to "undermine confidence" in the verdict. Ibid.

Wearry v. Cain, 136 S. Ct. 1002, 1006 (2016). The Supreme Court has also explained:

> We have ... held that the duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).... Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." [Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).] In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles, 514 U.S., at 437, 115 S.Ct. 1555.

Strickler v. Greene, 527 U.S. 263, 280-81 (1999).

Therefore, in summary: to prevail on a Brady claim, a petitioner must establish three elements: "(1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment." DiLosa v. Cain, 279 F.3d 259, 262-63 (5th Cir. 2002).

Petitioner's Brady claim falters on the very first prong of that analysis. Petitioner has offered no evidence whatsoever in support of his bald allegation that the state offered petitioner a "deal" in exchange for his testimony. That failure to provide any evidence on the initial prong of the Brady inquiry is, in and of itself, fatal. Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *5 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *5 (E.D. La. May 7, 2009), aff'd, 359 F. App'x 462 (5th Cir. 2009); Watson v. Cain, Civ. Action No. 06-613, 2007 WL 1455978, at *7 (E.D. La. May 17, 2007); Abron v. Cain, Civ. Action No. 05-876, 2006 WL 2849773, at * 10 (E.D. La. Oct. 3, 2006); see Harris v. United States, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998) ("[T]he government

does not bear the burden of establishing that documents were not withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him]."), aff'd, 216 F.3d 1072 (2nd Cir. 2000).

The undersigned acknowledges that the record demonstrates that the state disclosed to the defense days before trial that Pierce claimed that "on the night of the incident in question he was told during an interview with state police that if he cooperated he would not be arrested."[288]  The prosecution stated for the record, not in front of the jury, that notice was provided.[289]  It is clear that the defense was aware of the information as it questioned Pierce about it on cross-examination.[290]  Nonetheless, there is no evidence that there was any deal between the prosecution and the petitioner and petitioner confirmed that the prosecution promised him nothing for testifying.[291]  In fact, as previously explained, prior to jury selection, the prosecution confirmed that there was no deal between the District Attorney's Office and any of the co-defendants; rather, Pierce was granted use immunity.[292]

Petitioner has failed to demonstrate that the state courts' decision denying his Brady claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), this Court should defer to the state courts' decision and likewise deny the claim.

With respect to his claim that his conviction was obtained in violation of Napue v. Illinois, 360 U.S. 264, 269 (1959), it is true that due process may be violated if a prosecutor knowingly uses false testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States,

---

[288] State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, p. 159.
[289] Id., at pp. 159-160.
[290] Id., at pp. 140-141
[291] Id., at p. 110.
[292] State Rec., Vol. 1 of 4, trial transcript of May 23, 2011, pp. 4-6.

405 U.S. 150, 153 (1972); Napue, 360 U.S. at 269; Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996). However, a petitioner is entitled to relief on such a claim only if he shows that (1) the testimony in question was actually false, (2) the prosecutor knew it was false, and (3) the testimony was material. Duncan v. Cockrell, 70 F. App'x 741, 744 (5th Cir. 2003). Evidence is 'false' if, inter alia, it is specific misleading evidence important to the prosecution's case in chief. False evidence is 'material' only if there is any reasonable likelihood that it could have affected the jury's verdict." Id.

Perjury is the offering of "false testimony concerning a material matter with the *willful intent* to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993) (emphasis added).

Here, Pierce testified that, when the vehicle was stopped and he was questioned, he asked the troopers if he could cut a deal with them, but that they said "no" at that time.[293] He truthfully testified that his testimony at Smith's trial could not be used against Pierce at his own trial.[294] While Pierce previously claimed in his letter to the prosecution that the troopers told him he would not be arrested if he cooperated, there is no evidence that what he claimed was in fact true. The conversations that occurred during the traffic stop were recorded and defense counsel did not play any portion of the recording that demonstrated that the troopers told Pierce he would not be arrested if he cooperated.[295] It may be that Pierce lied in his letter to the prosecution, and then, faced with the penalty of perjury, truthfully testified that the troopers declined to "cut a deal" with him.

Based on the record, petitioner has not shown that Pierce's testimony was in fact false. Likewise, petitioner has failed to prove that the prosecution directed or procured Pierce's alleged

---

[293] State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, p. 144.
[294] Id., at pp. 149, 156-57.
[295] Id., at p. 143.

perjured testimony. For these reasons, petitioner has not shown that the state courts' decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Therefore, relief is not warranted.

### M & N.  Ineffective Assistance of Counsel Regarding Plea Offer

Petitioner's next two claims are intertwined and involve claims that his trial counsel failed to communicate to the prosecutor that he would accept a plea offer of two years without a multiple bill if placed in writing or orally told by the prosecutor.

Petitioner raised the issue in his original and supplemental application for post-conviction relief.  The trial court, in denying relief, explained:

> The defendant admits that Ms. McNabb communicated the two year offer to him, and that he did not unconditionally accept it.  Instead, he told his attorney to obtain more details about the offer.  According to Mr. Smith, when he inquired about the original offer immediately before trial, the state made it clear that the original offer was no longer available, and that if he wanted to plead guilty to the charges he would have to accept a fifteen year sentence.  He now claims with full benefit of hindsight that he always intended to accept the original offer, but he just wanted more details about the offer before accepting it.
>
> It should be pointed out that the defendant was arrested December 23, 2010, and that the pre-trial conference at which a possible sentence was discussed was held on March 24, 2011, in chambers.  The court's private notes indicate that both the prosecutor and the defendant's attorney, Ms. McNabb, were present.  The defendant was not present.  At that time, the court, not the prosecutor, offered the defendant a sentence of two years hard labor, the minimum mandatory sentence for the charge of possession with intent to distribute hydrocodone, in exchange for a plea of guilty to each charge against him.  At that time, the court erroneously believed Mr. Smith had been convicted of only one prior felony offense.  However, the defendant had, in fact, been convicted of three prior felony offenses and was subject to habitual offender prosecution, which could have resulted in a mandatory sentence in excess of two years.  As a result, it was the prosecutor and not the court who had the final word on whether or not a sentence of only two years would be imposed.
>
> For whatever reason, the defendant did not accept the two year offer of which he was aware prior to trial, so the trial leading to his conviction commenced on May 23, 2011.

In State of Louisiana v. Givens, 776 So.2d 443 (La. 2001), the Louisiana Supreme Court set forth the rules regarding plea agreements:

> "In determining the validity of agreements not to prosecute or of plea agreements, Louisiana courts generally refer to rules of contract law, while recognizing at the same time that a criminal defendant's constitutional right to fairness may be broader than his or her rights under contract law ….The first step under contract law is to determine whether a contract was formed in the first place through offer and acceptance….That party demanding performance of a contract has the burden of proving its existence….In the context of plea bargains, a defendant may demand specific performance of the state's promise if he can show that the parties reached an agreement, that he performed his part of the agreement, and that in doing so, he relinquished a fundamental right."
>
> There appears to be no doubt that a pre-trial plea bargain agreement was not reached in this case. It is equally clear that the defendant did not at any point relinquish any fundamental rights he enjoyed as a person accused of committing the crimes with which he was charged. Under those circumstances, the state could unilaterally exercise its right to withdraw consent to any plea agreement that might have been confected. A defendant does not have a right to a pre-trial plea agreement of any kind. Even if a plea agreement is reached, is not entitled to specific performance of that agreement unless he has relied on the same to his detriment.
>
> For these reasons, it cannot be said that trial counsel in this case was ineffective for failing to secure a pre-trial plea agreement. This claim by Mr. Smith is of no merit.[296]

The state district court denied the supplemental claim for the same reasons detailed above.[297]

The Louisiana First Circuit found that petitioner failed to meet his burden of proving the outcome of his appeal would have been different, citing, Strickland.[298] The Louisiana Supreme Court similarly found he failed to show he received ineffective assistance of counsel under Strickland.[299]

In Missouri v. Frye, 566 U.S. 134, 138-46, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012) and Lafler v. Cooper, 566 U.S. 156, 162-63, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012), the Supreme Court held that the Sixth Amendment right to effective assistance of counsel extends to the negotiation and consideration of plea offers that lapse or are rejected. In Frye, the Court

---

[296] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 14-15.
[297] Id., at p. 23.
[298] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[299] State ex rel. Smith, 249 So. 3d at 824; State Rec., Vol. 4 of 4.

specifically held that counsel has a "duty to communicate formal offers from the prosecution to accept a plea," and that, in general, where such an offer is not communicated to the defendant, counsel "[does] not render the effective assistance the Constitution requires." Frye, 566 U.S. at 145, 132 S.Ct. 1399.

In addition to proving that counsel's performance was objectively deficient, a petitioner must also meet his burden under Strickland's second prong and prove that counsel's errors actually prejudiced his case. To prove actual prejudice in connection with plea proceedings, a petitioner must demonstrate "that the outcome of the plea process would have been different with competent advice." Lafler, 566 U.S. at 163, 132 S.Ct. 1376. Thus, the petitioner must show that (1) "there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)," (2) "that the court would have accepted its terms," and (3) "that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Id. at 164, 132 S.Ct. 1376.

As the state district court noted, the offer was extended by the court, not the prosecution, and was made under the erroneous belief that petitioner had only one prior conviction.[300] Petitioner does not dispute that his counsel communicated the offer to him. There is no proof, nor does Smith contends that his counsel advised him not to accept the plea offer. Petitioner, rather, claims that he asked counsel to gather more information about the offer, specifically whether he would be eligible for parole. He claims his counsel failed to communicate with him about the plea offer again until shortly before trial when he was told that the offer was a fifteen year sentence with no chance of good time or parole.

---

[300] The trial court's personal notes of the March 24, 2011, conference in chambers are not part of the record and there are no corresponding minutes.

In any event, petitioner has failed to prove that prejudice resulted. As previously explained, under <u>Lafler</u>, a petitioner is required to prove that he was prejudiced by showing that "the outcome of the plea process would have been different with competent advice." <u>Lafler</u>, 132 S.Ct. at 1384. Specifically, he must prove "that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." <u>Id.</u> at 1385. Petitioner has not made that showing.

As previously stated, it is undisputed that the trial court, not the prosecution made the offer, and that the trial court did so without full knowledge of petitioner's complete criminal history. Petitioner has not shown a reasonable probability that the <u>prosecution</u> would have agreed to such an offer and presented it to the court and that the court, once it learned of petitioner's criminal history, would have accepted its terms.

Having failed to prove any of the factors pronounced in <u>Frye</u>, Smith has not shown that the state courts' denial of relief on this issue was contrary to or an unreasonable application of <u>Frye</u> or <u>Strickland</u>. He is not entitled to relief on this claim.

### O.    Use of Hearsay in Violation of Crawford

Smith next alleges that the testimony from Jason Pierce regarding DeHart's purchase of medications for Smith and distribution of drugs to Thomas Smith was inadmissible hearsay which deprived him of his right of confrontation in violation of <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), as neither DeHart nor Thomas Smith testified at trial.

Petitioner raised his claim in his supplemental application for post conviction relief.  The

state district court found he was not entitled to relief, explaining:

> By way of this assignment of error, the defendant raises an issue about his
> right to confront witnesses against him.  He alleges that the state's witness, Jason
> Pierce, testified about the illegal purchase of drugs by another individual, Ashley
> DeHart, on the defendant's behalf, and the distribution of drugs by the defendant to
> other persons, including someone named Thomas Smith.  He claims the testimony
> of Mr. Pierce constituted inadmissible hearsay evidence that deprived him of his
> right of confrontation.  Neither Ashley DeHart nor Tommy Smith testified at the
> defendant's trial.
>
> The court has carefully reviewed the transcript of the trial testimony of Jason
> Pierce.  (<u>Transcript</u>, May 25, 2011, p. 108, line 24, through p. 157, line 7.)  On direct
> examination by the state, clearly no discernible hearsay evidence was given by the
> witness.  The testimony he did give about the involvement of Ashley DeHart in drug
> dealing for the defendant dealt with her travel to and from Texas with him and the
> defendant on the date the instant crimes were committed.  He testified that she had
> been present during such previous trips.  He testified that Ashley went to different
> doctors to obtain prescription medicine and that Mr. Smith had made arrangements
> with her to obtain prescription medicine just like he made with him.  Mr. Pierce did
> not state that any of the information he had regarding Ashley DeHart was based on
> anything she told him.  It appears that he was present and participating in the joint
> criminal enterprise whenever Ashley DeHart was present.
>
> When questioned by defense counsel, Mr. Pierce claimed that an individual
> named Tommy Smith accompanied him and the defendant on a trip to Texas to buy
> drugs.  He did not offer any statements made by Tommy Smith in connection with
> any of these activities.
>
> Inasmuch as Jason Pierce did not offer hearsay evidence by way of his
> testimony at the defendant's trial, no violation of the defendant's right to confront
> witnesses is implicated.
>
> This complaint by the defendant does not present a valid claim for post
> conviction relief.[301]

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing

La. Code Crim. P. art. 930.2.[302]  The Louisiana Supreme Court similarly found he failed to satisfy

his post-conviction burden of proof.[303]

---

[301] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 23-24.
[302] <u>Smith</u>, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[303] <u>State ex rel. Smith</u>, 249 So.3d at 824; State Rec. Vol. 4 of 4.

The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.  A Confrontation Clause claim presents a mixed question of law and fact.  Fratta v. Quarterman, 536 F.3d 485, 499 (5th Cir. 2008).  Therefore, this Court must defer to the state courts' decision rejecting the claim unless petitioner demonstrates that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

In Crawford v. Washington, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause prohibits admission of testimonial hearsay against a defendant unless the witness is unavailable at trial and the defendant had a prior opportunity to cross-examine the witness.  Simply put, "the Confrontation Clause prohibits (1) testimonial out-of-court statements; (2) made by a person who does not appear at trial; (3) received against the accused; (4) to establish the truth of the matter asserted; (5) unless the declarant is unavailable and the defendant had a prior opportunity to cross examine him."  United States v. Gonzales, 436 F.3d 560, 576 (5th Cir.2006).  Here, there simply was no violation.

For the reasons explained by the trial court, the challenged statements made by Pierce violated neither the state rules of evidence against hearsay nor the federal Confrontation Clause. A review of his testimony demonstrates that Pierce did not offer any statements made by DeHart or Tommy Smith.  Rather, he testified that DeHart was present with him and petitioner on various trips to Texas for the purpose of obtaining prescription medications for resale.[304]  He further testified that Tommy Smith accompanied them on one occasion and that he witnessed petitioner sell medication to Tommy Smith on one occasion.[305]

---

[304] State Rec., Supp. Vol. 1 of 1, trial transcript of May 25, 2011, pp. 112, 114, 116-117, 119, 124, 135.
[305] Id., at pp. 135, 136-37.

For these reasons, the denial of relief on this claim was not contrary to established Supreme Court case law or an unreasonable application of Supreme Court precedent. Smith is not entitled to relief on this claim.

### P.  Unlawful Arrest/False Testimony

Petitioner next contends Trooper Mason submitted a false affidavit in support of his arrest and lied at the suppression hearing.[306]

The state district court, in denying the claim raised in petitioner's supplemental application for post-conviction relief, explained:

> In his sixth supplemental claim, the defendant alleges that the seizure of the prescription medicines by the Louisiana State Police at the time of his traffic stop was illegal, than an affidavit submitted by Trooper Christian Mason "in support of my arrest" was false, and that Trooper Mason testified falsely at the suppression hearing conducted before his trial.
>
> As noted hereinabove, the evidence referred to by the defendant was seized by the Louisiana State Police following a traffic stop of the defendant for speeding. On May 13, 2011, the defendant, through counsel filed a motion to suppress the use of this evidence at his trial, alleging that [t]he traffic stop involving aforesaid search and seizure was unlawful."
>
> A pretrial hearing was held on the motion to suppress on May 23, 2011. The state offered as evidence the testimony of the two state troopers on the scene, Trooper Christopher Mason and Trooper Michael Stewart. The defendant offered the testimony of one of the occupants of the vehicle, Ashley DeHart.
>
> Following the testimony of the witnesses, the court refused to grant the defendant's motion to suppress. The court found, based on the uncontradicted testimony of Trooper Mason, that there was probable cause to stop the vehicle for speeding because state police radar registered the vehicle traveling 89 miles per hour in a 70 miles per hour zone. The court also found that the search of the vehicle was proper because Ashley DeHart, one of the occupants of the vehicle, admitted giving the state police troopers permission to search the vehicle at the time of the stop. Ms. DeHart admitted that she presented herself as the owner of the vehicle, even though it turned out that the vehicle, in fact, was registered to her grandparents, who were not present on the scene. Ms. DeHart explained to the court that she claimed the vehicle was hers even though it was not registered in her name because she did not have the credit to buy it in her name.

---

[306] To the extent petitioner argues that the stop and search of the vehicle and the seizure of the evidence was illegal, the Court has previously addressed that claim.

The thorough search of the vehicle, including the items found in a backpack which belonged to Mr. Smith, occurred after someone in the vehicle admitted that Ms. DeHart had a small amount of marijuana in her purse.

Under these facts and circumstances, the court found and still believes, that the search of the defendant's backpack was constitutionally proper. Granting of the motion to suppress would have been error.

The defendant also complains that Trooper Mason lied under oath at the suppression hearing and that he presented a false affidavit in connection with the defendant's arrest. The court has not been made privy to the affidavit to which Mr. Smith refers. It appears that Mr. Smith was not arrested pursuant to any warrant, but was arrested at the scene of the stop. Neither has the defendant specified to the court what lies Trooper Mason told at the suppression hearing. Out of caution, the court has reviewed the testimony of Trooper Mason and compared that testimony to the videotape recording, including audio, of the stop in question. There do not appear to be any discrepancies of any significance between the two.

This assignment of error has no merit.[307]

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[308] The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[309]

Initially, as the state district court noted, there is no evidence that petitioner was arrested pursuant to an arrest warrant. Rather, it appears he was the subject of a warrantless arrest after the troopers interviewed him and the other occupants of the vehicle and searched the vehicle and found the evidence discussed throughout this report. Thus, petitioner's claim that Trooper Mason submitted a false affidavit in support of his arrest warrant is wholly frivolous.

While Smith alleges that Trooper Mason did not have reasonable suspicion to call for backup assistance, he offers no federal law which requires a law enforcement officer to have reasonable suspicion to call for assistance at a traffic stop. This claim is also wholly frivolous.

Finally, petitioner fails to point to any specific testimony by Trooper Mason given at the suppression hearing he claims was false. The trial court explained that it reviewed the audio and

---

[307] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 24-26.
[308] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[309] State ex rel. Smith, 249 So.3d at 824; State Rec. Vol. 4 of 4.

video of the stop and compared it to Trooper Mason's testimony and found no discrepancies of any significance.

For these reasons, petitioner has failed to demonstrate that the denial of relief on this claim was contrary to established Supreme Court case law or an unreasonable application of Supreme Court precedent. Smith is not entitled to relief on this claim.

### R.  Ineffective Assistance of Counsel- Multiple Bill

Petitioner claims his counsel was ineffective for failing to file or argue objections to the use of unconstitutionally contained convictions making up the multiple bill.

Petitioner raised this issue in his supplemental application for post-conviction relief. The trial court, in denying relief, found:

> Following his convictions in this case, and pursuant to La. R.S. 15:529.1, the state filed a habitual offender bill of information against Mr. Smith, on September 14, 2011. At that time, the defendant entered a not guilty plea to the bill and an adjudication hearing was scheduled for November 16, 2011.
>
> The habitual offender bill of information detailed three prior felony convictions of the defendant that the state intended to use as a basis for the habitual offender adjudication. The first was a conviction on November 22, 1996, for possession of cocaine, by a plea of guilty in docket number 275528 of the 32nd Judicial District Court. The second conviction was on March 14, 2003, for attempted possession of a firearm by a convicted felon, by a plea of guilty in docket number 394965 of the 32nd Judicial District Court. The final conviction was also on March 14, 2003, for a second charge of attempted possession of a firearm by a convicted felon, by a plea of guilty in docket number 396689 of the 32nd Judicial District Court.
>
> Between the time of the defendant's plea and the hearing, defense counsel did not file any motion to suppress the use of the predicate offenses described in the bill of information. The court has reviewed the transcript of the adjudication hearing conducted on November 16, 2011. It reveals that the state was prepared to offer fingerprint evidence to prove that the defendant was the same person previously convicted in all three prior felony matters. However, the defendant, through counsel, acknowledged that he was the same person previously convicted in all three matters, so the fingerprint evidence was never admitted. In addition, the court questioned Mr. Smith extensively, and found that he had voluntarily agreed to admit to the identification with a full understanding of his rights and a full understanding of the consequences of making the admission. Thereafter, the state offered documents confirming that the defendant entered pleas of guilty to each of the felony charges

of which he was previously convicted and that at the time of each conviction, he was represented by counsel. The court found that the state had carried its burden of proving availability of those convictions for use as predicate offenses to enhance the defendant's sentences under the Louisiana habitual offender law. The defendant did not offer any evidence to show that the prior felony convictions were unavailable for use for sentence enhancement purposes.

In his post conviction relief application, Mr. Smith merely alleges that counsel did not file any oral or written objection to the multiple offender bill of information in order to "preserve these objections resulting in unconstitutional forfeiture on direct appeal…." He is correct that counsel did not file any oral or written objection to the multiple offender proceeding.

However, the defendant has not suggested in any way what those objections might have been, or that there exists grounds, legal or factual, upon which he should not been adjudicated by the court as an habitual offender. At the hearing, the court carefully reviewed the documents offered by the state and confirmed that the state had clearly established a prima facie case that the predicate convictions were constitutionally firm. The court has reviewed them again and maintains that position. Even now, the defendant has offered nothing to suggest that there is evidence to show that these prior convictions are somehow constitutionally deficient.

For these reasons, the defendant is not entitled to post conviction relief with regard to his habitual offender adjudication.[310]

The Louisiana First Circuit found that petitioner failed to meet his burden of proving the outcome of his appeal would have been different, citing Strickland.[311] The Louisiana Supreme Court similarly found he failed to show he received ineffective assistance of counsel under Strickland.[312]

As indicated by the trial court, at the habitual offender hearing, petitioner pled guilty and admitted that he was the same person convicted of the offenses alleged.[313] Nonetheless, the state provided the trial court with certified copies of his prior convictions showing that he had pled guilty and was represented by an attorney in each case.[314] When the trial court explained to petitioner that, by admitting he was the same person in three convictions, the state would not have

---

[310] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 25-29.
[311] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[312] State ex rel. Smith, 249 So. 3d at 824; State Rec., Vol. 4 of 4.
[313] State Rec., Vol. 1 of 4, hearing transcript of September 14, 2011, p. 5, 8.
[314] Id., at p. 5-7.

to prove his identity, and the fingerprint expert, Mr. Null, who was present, would not have to testify, petitioner responded, "That's cool."[315]  Petitioner acknowledged his right to a hearing and voluntarily waived it.[316]  The trial court found that petitioner was the same person convicted on May 26, 2011 as well of the predicate offenses alleged.[317]

Petitioner has not suggested what legal or factual objections his counsel should have raised. The record includes copies of petitioner's prior conviction packets, including the bills of information with his fingerprints, the waiver of constitutional rights and plea of guilty forms, and the minutes.[318]  The minutes of each indicate that petitioner was represented by counsel.[319]  As indicated by the trial court, a fingerprint expert was present and ready to testify that petitioner was the same person convicted in each case.  As such, petitioner has not demonstrated his counsel's performance was constitutionally deficient.  Nor has he demonstrated a reasonable probability that any objection by defense counsel would have resulted in a different outcome.  As a result, he has not shown prejudice.

For the reasons expressed, petitioner cannot show that the state courts' decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### S.  Judgment of Acquittal

Petitioner next claims that the entirety of the evidence, both admissible and inadmissible, was not sufficient to support his convictions and the trial court erred in failing to grant his judgment of acquittal.

---

[315] Id., at p. 8.
[316] Id., at pp. 9-10.
[317] Id., at p. 13.
[318] State Rec. ,Vol. 1 of 4, Certified Conviction Packets for Case Nos. 275,528, 396,689, 394,965 dated September 8, 2011.
[319] Id.

Petitioner raised this claim in his supplemental application for post conviction relief.  The state district court denied relief, explaining:

> The defendant's ninth supplemental assignment of error raises the issue of the weight of the evidence against him.  He maintains the evidence received at his trial was insufficient to support his convictions.
>
> As pointed out hereinabove, the First Circuit Court of Appeal has already considered this allegation by the defendant.  In its decision of May 2, 2014, the court noted that "the defendant argues that there was insufficient evidence to convict him of possession with intent to distribute the medications found in the car …This assignment of error is without merit."  Because the court of appeal has already considered this complaint and ruled against the defendant, this court will not grant any post conviction relief regarding the same.[320]

The Louisiana First Circuit found that petitioner failed to meet his burden of proof, citing La. Code Crim. P. art. 930.2.[321]  The Louisiana Supreme Court similarly found he failed to satisfy his post-conviction burden of proof.[322]

For the reasons previously explained in section A., when the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was irrational.  As such, petitioner has failed to show that the trial court erred in denying his motion for post-verdict judgment of acquittal.  Therefore, petitioner cannot show that the state courts' decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### T.  Conflict of Interest/Constructive Denial of Counsel

Petitioner claims he was constructively denied counsel because McNabb failed to subject the prosecution's case to meaningful adversarial testing and preserve claims for appeal.  He further claims McNabb had a conflict of interest preventing her from filing post-trial motions such as

---

[320] State Rec. Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, p. 29.
[321] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[322] State ex rel. Smith, 249 So.3d at 824; State Rec. Vol. 4 of 4.

motion for arrest of judgment, post-trial motion for judgment of acquittal and a motion for new trial because she would have had to admit that she was ineffective.

Petitioner raised his claim in his supplemental application for post conviction relief. The state district court found the claim to be meritless. The trial court explained:

> The defendant next claims that he was denied his constitutionally guaranteed right to effective counsel because his trial counsel, Ms. McNabb, had a conflict of interest that case her to fail to file proper post trial motions on his behalf. In essence, the defendant argues that any complaints raised by way of these post conviction proceedings should have been raised by her by way of post trial motions. To the extent she did not do so, her performance fell below the standard of care owed by her to him, resulting in a violation of his constitutionally protected right to effective counsel.
>
> The court has already considered herein the complaints of Mr. Smith regarding alleged ineffective assistance of counsel by both Ms. McNabb and Mr. Thomas. With regard to each complaint, the court has found that performance by the attorneys was not deficient, or if there was deficient performance, the defendant was not prejudiced by the same. As a result, the defendant's complaint that Ms. McNabb was deficient in her performance because she did not file post trial motions based on her own ineffective assistance of counsel, is in and of itself without merit.[323] .

The Louisiana First Circuit found that petitioner failed to meet his burden of proving the outcome of his appeal would have been different, citing, Strickland.[324] The Louisiana Supreme Court similarly found he failed to show he received ineffective assistance of counsel under Strickland.[325]

In United States v. Cronic, 466 U.S. 648 (1984), the Supreme Court held that a defendant may be constructively denied counsel, even though an attorney had been appointed to represent him. The Cronic Court recognized that the performance of counsel may be so inadequate as to constitute no assistance of counsel at all, despite the physical presence of an attorney at the proceeding. Cronic, 466 U.S. at 654 n. 11. The Cronic presumption of prejudice arises in

---

[323] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, pp. 29-30.
[324] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[325] State ex rel. Smith, 249 So. 3d at 824; State Rec., Vol. 4 of 4.

circumstances where: (1) there exists a "complete denial of counsel" or a denial of counsel "at a critical stage" of defendant's trial; (2) defense counsel fails to "subject the prosecution's case to meaningful adversarial testing"; or (3) counsel is called upon to render assistance in "circumstances of magnitude" such that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial. Cronic, 466 U.S. at 658-60 (citations omitted).

The Supreme Court has also emphasized that, for Cronic to apply, "the attorney's failure must be complete." Bell v. Cone, 535 U.S. 685, 697 (2002). "For purposes of distinguishing between the rule of Strickland and that of Cronic," the Supreme Court held that a case does not come under Cronic merely because counsel failed to "oppose the prosecution ... at specific points" in the proceeding. Bell, 535 U.S. at 697. The distinction between counsel's failure to oppose the prosecution entirely and counsel's failure to do so at certain points is a "difference ... not of degree but of kind." Bell, 535 U.S. at 697. The Cronic standard applies only when counsel has entirely failed to challenge the prosecution's case. Id. at 697, 122 S.Ct. 1843 (emphasis added); Riddle v. Cockrell, 288 F.3d 713, 718 (5th Cir. 2002) ("constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense); Mayo v. Cockrell, 287 F.3d 336, 340 n.3 (5th Cir. 2002); Burdine v. Johnson, 262 F.3d 336, 344 n.4 (5th Cir. 2001).

The petitioner has the burden to show that he was constructively denied counsel. Childress v. Johnson, 103 F.3d 1221, 1228, 1231-32 (5th Cir. 1997). "It is not enough for the defendant to show mere 'shoddy representation' or to prove the existence of 'errors, omissions, or strategic blunders' by counsel. Bad lawyering, regardless of how bad, does not support the [per se]

presumption of prejudice." <u>Johnson v. Cockrell</u>, 301 F.3d 234, 238-39 (5th Cir. 2002) (citing

<u>Jackson v. Johnson</u>, 150 F.3d 520, 525 (5th Cir. 1998) ) (quoting <u>Childress</u>, 103 F.3d at 1228-29).

The issue of the constructive denial of counsel under <u>Cronic</u> is a mixed question of law and

fact. <u>French v. Jones</u>, 225 F.3d 658, 2000 WL 1033021, at *3 (6th Cir. Jul. 18, 2000) (Table, Text

in Westlaw). Thus, the question before this court is whether the state courts' denial of relief on

this issue was contrary to or an unreasonable application of United States Supreme Court

precedent.

The state courts' denial of relief on this issue was not specifically based on <u>Cronic</u>. In the

last reasoned opinion, the Louisiana Supreme Court instead found that petitioner failed to show he

received ineffective assistance of counsel under <u>Strickland</u>. Nevertheless, Smith has not shown

this claim would have been evaluated differently under the <u>Cronic</u> presumption of prejudice.

The state court record reflects that McNabb filed multiple pretrial motions and actively

challenged the state's evidence throughout the trial. The transcripts of the state court proceedings

demonstrate that counsel was fully familiar with the case and adequately prepared to challenge the

state's evidence. Contrary to petitioner's claim, McNabb, in fact, filed the post-trial motions and

vigorously argued them at the hearing. There is nothing in this record to suggest that petitioner's

trial counsel was "inert" in her representation of petitioner at trial or at the hearing on the post-trial

motions. <u>Jackson</u>, 150 F.3d at 525. Smith has not established that he was constructively denied

counsel under the <u>Cronic</u> standard. The denial of relief on this issue was not contrary to or an

unreasonable application of Supreme Court law.

A different analysis applies when there is an allegation of conflict of interest. Specifically,

as the United States Fifth Circuit Court of Appeals has explained:

> A petitioner alleging a Sixth Amendment violation on the basis of counsel's
> purported conflict of interest, however, must bear a slightly different burden. In

Cuyler v. Sullivan, [446 U.S. 335, 345 (1980),] the Supreme Court considered whether "the mere possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel," and noted with approval its prior holding that there are circumstances under which an attorney may represent multiple criminal defendants in connection with the same criminal transaction without offending the Sixth Amendment.  The Court held that if the defendant did not object to the multiple representation at trial, such an arrangement can only give rise to a cognizable IAC claim if it actually affected the adequacy of the petitioner's representation.  In a later gloss on the Sullivan standard, the Court reiterated that an actual conflict, for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.  If the defendant establishes the existence of such a conflict, though, the prejudice prong of Strickland is relaxed such that the petitioner need not show that but for counsel's unprofessional errors, the result of the proceeding would have been different.

  The crux of the inquiry, therefore, is whether trial counsel had a conflict of interest that hampered the representation in the sense that counsel actively represented conflicting interests.  A conflict will exist only when counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.  Such a conflict does not arise, however, when the alleged conflict is merely hypothetical, speculative, or potential.  Relevant factors may include (1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter; (3) how close are the multiple representations in time; and (4) whether the prior representation has terminated.  As we have noted, Sullivan's 'actual conflict' and 'adverse effect' elements are rather vague, so IAC claims predicated on such conflicts are tightly bound to the particular facts.

Morin v. Thaler, 374 Fed. App'x 545, 551-52 (5th Cir. 2010) (emphasis omitted; footnotes, quotation marks, and brackets omitted); accord Perillo v. Johnson, 205 F.3d 775, 806 (5th Cir. 2000) ("Cuyler's adverse effect standard is set intentionally lower than Strickland's actual prejudice standard. ... Under Cuyler, the focus is upon whether the actual conflict burdening counsel's performance had an actual and adverse effect on counsel's performance.  Once it is established that there was an adverse effect on counsel's performance, prejudice, in terms of an effect on the outcome of the defendant's trial, is presumed."

Here, there was no actual conflict of interest because counsel did not engage in "multiple representation" and counsel did not "actively represent[] conflicting interests."  Cuyler, 466 U.S.

at 349-50 (1980).   The denial of relief on this claim was not contrary to or an unreasonable

application of Strickland.   Petitioner is not entitled to relief as to this claim.

## U.  Ineffective Assistance of Trial And Appellate Counsel

Petitioner's final claims are that counsel McNabb and Thomas were ineffective at the trial

and appellate level by failing to preserve his claims pursuant to L. Code Crim. P. art 841 and raise

them on direct appeal.   Significantly, he does not set forth which claims his trial counsel allegedly

failed to preserve nor those his appellate counsel failed to allege on appeal.

Petitioner raised this claim in a supplemental claim for post-conviction relief.   The state

district court found the claim to be meritless, explaining:

> Finally, as the defendant alleges that both trial and appellate counsel, Ms.
> McNabb and Mr. Thomas were ineffective because they failed to preserve and
> pursue on appeal, the claims he has raised by his post conviction application.   As
> pointed out above in the court's ruling with regard to Supplemental Assignment of
> error 10, performance by the attorneys was either not deficient or any alleged
> deficient performance did not result in any prejudice to the defendant.   Accordingly,
> Mr. Smith's complaint that Ms. McNabb and/or Mr. Thomas rendered deficient
> performance because they did not preserve and/or pursue issues on appeal, is without
> merit.[326]

The Louisiana First Circuit found that petitioner failed to meet his burden of proving the

outcome of his appeal would have been different, citing, Strickland.[327]   The Louisiana Supreme

Court similarly found he failed to show he received ineffective assistance of counsel under

Strickland.[328]

Again, petitioner did not set forth in this specific claim which claims he alleges his trial

counsel failed to preserve for purposes of appeal nor which claims his appellate counsel failed to

raise on appeal.   The Court has already addressed petitioner's claims regarding trial and appellate

---

[326] State Rec., Vol. 3 of 4, Reasons for Judgment Denying Post Conviction Relief dated July 22, 2016, p. 30.
[327] Smith, 2017 WL 679240 (La. App. 1st Cir. Feb. 21, 2017); State Rec., Vol. 4 of 4.
[328] State ex rel. Smith, 249 So. 3d at 824; State Rec., Vol. 4 of 4.

counsel above in sections I., M., N., R., and T., and found that petitioner is not entitled to relief. The Court notes that none of the substantive claims raised by petitioner in his original and supplemental application for relief were found to be procedurally barred for failure to preserve the issue pursuant to La. Code Crim. P. art. 841. Therefore, even had petitioner's trial counsel performed deficiently in failing to preserve an issue, he fails to demonstrate prejudice as every issue raised by petitioner has been addressed on the merits. The Court has already addressed petitioner's separate claim of ineffective assistance of appellate counsel for failing to raise certain issues on appeal and found that he is not entitled to relief.

In summary, to be entitled to relief, petitioner must demonstrate that the state courts' decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Smith clearly has not made that showing in the instant case. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Clyde Edward Smith be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

a failure to object.  28 U.S.C. § 636(b)(1); see Douglass v. United Services Auto. Ass'n, 79 F.3d

1415, 1430 (5th Cir. 1996) (en banc).

    New Orleans, Louisiana, this  16th  day of April, 2020.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**